[Civ. No. 23642. Second Dist., Div. Two. July 29, 1959.]

THOMAS S. BUNN et al., Appellants, v. LUCAS, PINO AND LUCAS (a Partnership) et al., Respondents.

Larwill & Wolfe, Thomas S. Bunn, Jr., and Charles W. Wolfe for Appellants.

Ball, Hunt & Hart and Joseph A. Ball for Respondents.

HERNDON, J.—The two appellants and the four respondents in this case are lawyers. Their unfortunate controversy involves disputed rights with respect to the substantial attor-

neys fees which were earned by the rendition of professional services in certain contested probate proceedings. These six lawyers collaborated successfully in representing the interests of a client who claimed a major share of a very large estate. At the outset the client had retained respondents Lucas, Pino, Lucas and Wicks to act as her attorneys pursuant to a contingent fee agreement. Thereafter, respondents, deeming it prudent to have the assistance of more experienced lawyers in a matter of such importance, sought the aid and counsel of appellants Bunn and Wood. The client, incidentally, is not a party to this litigation.

The significance of the facts shortly to be detailed will be made more readily apparent, we trust, by first presenting a very brief and general description of the nature of the controversy.

The basic issue of fact in this case is whether appellants Bunn and Wood became *joint venturers* with respondents in the performance of the professional services which were rendered in the representation of the client or whether the relationship between respondents and appellants was that of *employers and employees*. It is undisputed that under the agreement made at the time appellants were first brought into the case, respondents were employers and appellants were employees, and that the agreed amount of appellants' compensation was the sum of $15,000, payment of which, however, was to be contingent upon success in the litigation.

Appellants here contend: (1) that subsequent to their original employment, the probate litigation took an unexpected turn and that as a result of unforeseen developments they were requested to assume greater responsibilities and to render additional services neither contemplated at the time they were hired nor covered by the original agreement; (2) that these unexpected developments gave rise to a "new matter"; (3) that respondents' request for appellants' services in connection with this "new matter" and appellants' performance thereof without any new agreement upon the amount of appellants' compensation necessarily gave rise to an implied agreement creating a joint venture; and (4) that appellants, as joint venturers, are entitled to share equally in whatever fee respondents receive under their agreement with the client.

Respondents took the position that all of appellants' services were within the contemplation of the original agreement, so

that appellants were entitled to no more than the amount therein specified, to wit, the sum of $15,000. In respondents' view the unexpected developments in the probate litigation did not give rise to any "new matter." The essence of their response to this contention was that in the course of lawsuits new and unforeseen developments are so common that experienced lawyers always expect the unexpected. As a secondary proposition, respondents have contended that if any services were rendered by appellants which were not contemplated at the time of the original hiring and not covered by the original agreement, such services should be compensated on the basis of their reasonable value. They argue that appellants at all times regarded themselves, and were regarded, as respondents' employees—a relationship utterly inconsistent with the relationship of joint venturers.

The trial court found in substance: (1) that appellants were employed by respondents to perform certain services by way of assisting respondents in connection with a pending proceeding to determine heirship; (2) that appellants were not employed by the client, either directly or indirectly, and that no contractual relationship existed between appellants and the client; (3) that appellants were not at any time partners of or joint venturers with the respondents; (4) that as a result of unexpected developments in the litigation "the problems of the case became much more extensive and complex than those contemplated by the parties" when they entered into their original agreement; (5) that appellants rendered services in connection with certain new proceedings initiated in the probate matter by an adverse party, which services were not within the contemplation of the original agreement; and (6) that the reasonable value of all the professional services rendered by appellants to respondents is the sum of $40,000. The judgment of which appellants complain awards them the said sum of $40,000.

After a review of the record, we have concluded that the determinative findings of the trial court are unassailable. Indeed, the basic finding to the effect that no joint venture was created is supported by the overwhelming weight of the evidence. Hence, in this case, it is unnecessary to invoke the familiar rule that the facts should be viewed in the light most favorable to respondents. We shall now proceed to state the salient facts in more detail.

Malcolm M. Lucas, his brother, Campbell M. Lucas, and James R. Pino practiced law in Long Beach, California, as

partners under the name of Lucas, Pino and Lucas. Richard Wicks is a professor of law at the University of Southern California Law School. He also engages in the practice of law, specializing in probate matters. All four respondent lawyers are young men admitted to the bar within the last 10 years.

In April, 1956, Mrs. Shirley Young, who previously had been a client of Malcolm Lucas, went to the office of Lucas, Pino and Lucas, seeking legal assistance in connection with the estate of her deceased grandmother, Leona M. Crawford. Mrs. Crawford had died earlier that year in Long Beach, leaving a will dated November 15, 1953, which named Columbia University of New York City as the principal beneficiary. When Mr. Lucas examined Mrs. Crawford's will he noticed that it contained no provision which would be effective to avoid the restrictions on charitable gifts found in Probate Code sections 40-43. His immediate impression was that if Mrs. Young could establish the fact that she was the relative to whom the property would have gone but for the charitable dispositions, then under Probate Code, section 41, she would be entitled to distribution of two-thirds of the property which Mrs. Crawford had bequeathed to the university.

Lucas thereupon consulted Richard Wicks and the latter was associated with the firm under an agreement providing that he was to receive one-fourth of any fee which the partnership might receive in connection with this matter. Thereafter, a written contract was executed between Attorneys Lucas, Pino and Lucas and Richard Wicks (hereinafter sometimes referred to as Lucas and Wicks) and Shirley Young, as client, whereby said attorneys were retained in consideration of a contingent fee to be computed upon percentages of any distributions to Mrs. Young from the estate of Crawford.

During the summer of 1956 Lucas and Wicks worked on the problems posed by the Crawford will and in September, 1956, they filed a petition under section 1080 of the Probate Code to determine heirship and to establish the rights of Mrs. Young in the estate. The hearing on this petition was set for November 5, 1956. Since none of the four respondents considered themselves ''courtroom lawyers'' they decided to engage an older attorney for advice in the preparation and presentation of their case.

Accordingly, in the early part of October, 1956, Lucas and Wicks approached appellant Thomas S. Bunn, the father of a law school classmate of Malcolm Lucas. At a luncheon meet-

ing, Malcolm explained to Mr. Bunn the general nature of the problems involved, stating that the estate was valued at "between two and three million dollars" and referring to the pendency of the heirship proceedings which respondents had initiated on behalf of Mrs. Young. Lucas told Bunn that he and his associates desired the assistance of an experienced attorney at the time of the hearing on the pending petition to determine heirship. When Bunn asked what amount they were prepared to pay for such assistance, Lucas replied that they had a "top figure in mind which was $5000 contingent upon our successful completion of the case." According to Mr. Bunn's testimony, he offered to give Malcolm free advice, but Malcolm "insisted that they were not willing to take the assistance gratuitously from me and that they insisted on paying for it." Bunn then suggested a meeting with his associate, Thomas A. Wood. This meeting was accordingly scheduled for October 10, 1956, at the office of Bunn and Wood. On that date Lucas and Wicks first conferred with Bunn alone. Bunn told them that Wood was the man that they should hire, but he apprehended that Wood would not accept a limited employment but would insist on playing a dominant role which Bunn characterized as "sitting at the head of the table."

Wood thereafter joined the conference, and was informed generally concerning the earlier discussions and the nature of the employment contemplated. There was a discussion of the petition to determine heirship, the legal points involved, including the tax problems. Wood was informed that respondents simply desired aid and counsel with respect to procedural matters at the hearing. Wood responded that he did not like to handle matters in that way; that if he went into a case he would expect to do his own research and would assume considerable responsibility, and that in view of the responsibilities that he would expect to undertake if he accepted such employment a contingent fee of $5000 would not be satisfactory. By way of counterproposal, Wood stated that he and Bunn would accept employment for the sum of $15,000, contingent on success.

According to Bunn's testimony, the response of Lucas and Wicks to Wood's counterproposal was as follows: "After Mr. Wood had made the statement that we would do it for $15,000 on a contingent basis, one of them, I think, said, 'We are not used to that kind of money. . . . We consider it high . . .' That is more money than we contemplated paying." However, Lucas and Wicks indicated that they would discuss the

matter with their associates and inform appellants promptly as to their decision. At the conclusion of the conference, and as Lucas and Wicks were leaving, Wood stated to them that he hoped they had the case on a good fee arrangement and Bunn said: "I hope so, too, but don't tell us anything about it."

The following day Lucas advised Bunn by telephone that his partners had agreed to pay the fee of $15,000 contingent on success. Wood and Bunn immediately commenced work on the case. It is apparent from the record that for a period of some six weeks, from October 11th to November 20th, Wood and Bunn entered actively into every phase of the case. Mr. Wood took a prominent part in various settlement negotiations and in discussions of the legal issues and tax problems involved in the case.

On October 11, 1956, Wood, Bunn and Malcolm Lucas drove to Beverly Hills and there questioned Attorney Kenneth D. Holland, a nephew of Mrs. Crawford, concerning matters of family history. From him they learned that another attorney, Paul D. Holland, had drawn an earlier will for Mrs. Crawford which also had named Columbia University as the principal beneficiary. This prior will evidently contained a clause which would have been effective to avoid section 41 of the Probate Code limiting the amount of the charitable bequests. However, as we have noted, Mrs. Crawford's later will contained no such saving clause.

Thereafter, Wood, Bunn, Lucas and Wicks had numerous conferences in which they discussed the facts and the applicable law. They met with Attorneys Tackabury and Ingram, who represented the trustees of Columbia University, and discussed various possible bases of settlement and the allocation of taxes as between the university and Mrs. Young in the event of settlement. As above indicated, it is apparent that Wood played a very active part in all the conferences and discussions. As he, himself, phrased it: "I acted as spokesman from the time we came into it until I got fired."

The so-called "unexpected turn" in the course of the litigation developed on November 20, 1956. On that date, Columbia University, through its local attorneys, filed a petition to probate the former will of Mrs. Crawford containing the clause which would render effective in its entirety the charitable bequest in favor of Columbia University, avoiding the restrictive effect of Probate Code, sections 41-43. It was obvious that

counsel for the university, in filing this petition, were seeking to invoke the doctrine of "dependent relative revocation," that is to say, that the revocation of the former will by the later was dependent upon, and relative to, the validity of the later will in all respects so far as necessary to carry out the intentions of the testatrix.

Appellants Bunn and Wood base their claim to additional fees upon the additional services which they rendered after November 20, 1956, contending that the filing of the petition to probate the former will upon the theory of "dependent relative revocation" gave rise to a new matter not contemplated by the employment contract under which they had been performing up to that time.

There is a substantial conflict in the evidence as to whether there was any discussion between appellants and respondents after November 20th of such a nature as to indicate an understanding that the new petition filed by the university would be regarded as a new matter which would entitle appellants to additional compensation. Both Malcolm Lucas and Wicks testified that after November 20th Bunn and Wood continued to participate in the case in essentially the same way that they had done during the preceding six-week period. They testified to their understanding and belief that appellants' services were still being performed under the express contract of October 11, 1956. In his testimony appellant Bunn admitted that he personally had no conversation with any of respondents which would have changed the existing fee arrangement in any way. Appellant Wood testified that at a meeting in his office on November 21st he had said: "Now, you fellows understand that this is a different piece of business than you originally brought into the office?" and that "They replied, 'Yes,' and I asked them if they wanted Mr. Bunn and I to handle it and they said, 'Yes.'" Lucas and Wicks denied that any such conversation took place. Wood further testified as follows concerning a conversation with Lucas which he said took place on December 5, 1956: "... I suggested to Mr. Lucas that he, Mr. Wicks, Mr. Bunn and myself should get together and adjust our position on fees in this matter, that we were now handling an entirely different matter and he turned around to me and he says, 'You go right ahead, there will be no question about fees being adjusted.' And that was all that was said as far as fees were concerned." Lucas denied that there was any such conversation. Wood further testified

that at a later time in March, 1957, after the settlement of the case, he suggested that Malcolm Lucas and Wicks come to his office and talk about fees; ''that we ought to sit down and settle the fee matter,'' and that Lucas said ''he and Mr. Wicks would be up to do it.'' Lucas testified that no such discussion occurred.

After further conferences with counsel representing Columbia University, the case was settled on January 7, 1957, and a decree determining heirship was accordingly entered in February, 1957. Under the terms of the settlement, Mrs. Young became entitled to distribution of amounts aggregating approximately $1,000,000.

Malcolm Lucas testified that Bunn or Wood first mentioned the matter of additional fees in April, 1957. Bunn called Lucas and said that he and Wood wanted to see Lucas and Wicks in regard to the estate. He said nothing about fees. A few days later Lucas went to the offices of Bunn and Wood. He met with Bunn and Wood in the latter's office at which time Wood said '' [w]e have called this meeting to discuss fees,'' and Lucas asked '' [w]hat about fees?'' Wood replied '' [w]e have done more work than we thought we were going to have to in this matter. We feel that we are entitled to more fees.'' Lucas inquired '' [w]hy didn't you tell me earlier that you were going to ask for more fees? . . . You say that you had to do more work because of what happened in November. . . . Now, it is April here and you never told me about a thing about this until this very day, sitting in your office.'' Wood replied '' [w]ell, it was an emergency. When you are fighting a fire you don't stop to talk about how much you are going to get paid for fighting this fire.'' Lucas said that he finally asked Bunn and Wood '' [w]hat do you fellows want in the way of a fee?'' and Wood replied '' [w]ell, Malcolm, I can't tell you. I don't know what you are getting. . . . If you tell us what you are getting, we will be able to tell you what we are entitled to, but we have got to know what your fee is to be fair to you and be fair to ourselves.''

In response to Wood's inquiry about the fee contract with Shirley Young, Lucas refused to disclose the contract and said to Wood: ''Don't you recall that you said, 'We don't want to know what the fee is,' . . . It has never been material before . . . you never based your fee on that and now you say you can't set a fee until you know what it is . . . it is a confidential matter and I am just not going to tell you.''

Sometime later, on April 30, 1957, Wicks and Malcolm

Lucas went to the offices of Bunn and Wood. Lucas made a memorandum of that conversation, which he produced at the time of the trial and which he used to refresh his memory. Wicks told Bunn and Wood that he thought the relationship between the lawyers was governed by the express contract of October 10th under which Lucas and Wicks agreed to pay Bunn and Wood the sum of $15,000 contingent upon success. Bunn and Wood countered that they were hired for a limited purpose and that when the petition to probate the former will was filed they undertook a new matter for which they felt they should have a larger fee. Harsh words were exchanged and there was argument about the determination of the "reasonable value" of the services which Bunn and Wood had rendered. Wicks finally made an offer to pay $20,000 in full settlement, but said he wanted it in writing. Wood appeared to be angered by this suggestion, stated that he was not interested and declared that the matter would have to be litigated. After expressing amazement at appellants' demands for a larger fee, Lucas declared: "So that there will be no further claim to a quantum meruit recovery . . . I want to notify you gentlemen right now that we terminate your services as of this minute."

Promptly after the foregoing conference, Malcolm Lucas forwarded a letter to Mr. Tackabury advising him that Bunn and Wood were no longer associated. A copy of this letter was sent to Bunn and Wood.

On May 21, 1957, Lucas and Wicks made a tender to Bunn and Wood of $15,000 in the form of a certified check on the First Western Bank of Long Beach. Bunn and Wood rejected the tender with a letter which contained the following language: "We have your letter of May 31, 1957, in which you enclose your check payable to us for $15,000. In view of the fact that you have attempted to make remittance serve as payment in full for our services to you and Mrs. Shirley Sandusky Young, and that it does not represent the *reasonable value* of our services, we return the check herewith." (Emphasis added.)

Bunn and Wood thereafter filed suit against respondent seeking declaratory relief. Their complaint alleges the existence of an actual controversy between the parties and states appellants' contentions in the following terms: "1—That the contract made and entered into on or about October 10, 1956, obligated plaintiffs only to advise defendants in connection with the matter then pending in the Matter of the Estate of

Leona M. Crawford, deceased, to-wit, the then pending Petition for Construction of Will and for Decree Determining Heirship and Interest in the Estate under Probate Code 1080; and that said agreement did not contemplate that plaintiffs would handle any other, new, or then unknown matters. 2— That for new matters arising subsequent to said original employment and involving new and different questions of fact and new and different questions of law, which plaintiffs were requested to manage, *there was an agreement to pay plaintiffs the reasonable value of their services.''* (Emphasis added.)

In the prayer of their complaint, after requesting a declaration in conformity with their contentions as above stated, appellants prayed ''that the court determine *the reasonable value* of plaintiffs' said services.'' (Emphasis added.)

It should be noted at this point that appellants were never attorneys of record for the client. It seems to have been clearly understood from the outset that appellants would not become attorneys of record. It is also clear and undisputed that appellants made no effort to ascertain the terms of respondents' fee contract with the client until after the dispute between appellants and respondents had arisen. Appellants first learned the terms of the said contract when a copy of it was produced on the occasion of the taking of the deposition of Mr. Wicks.

As we have heretofore indicated, the basic issue in this case is essentially a factual one: whether appellants became *joint venturers* with respondents, or whether their status continued to be (as admittedly it was at the beginning of the undertaking) that of respondents' *employees.* After restating certain well settled principles of law, we shall indicate the reasons for our conclusion that the trial court correctly decided this basic issue.

█ A joint venture is an undertaking by two or more persons jointly to carry out a single business enterprise for profit. (*Nelson* v. *Abraham,* 29 Cal.2d 745, 749 [177 P.2d 931]; *Hansen* v. *Burford,* 212 Cal. 100, 108-109 [297 P. 908].)
█ It is a consensual relationship originating in the voluntary agreement of the parties. (See *Campagna* v. *Market Street Railway Co.,* 24 Cal.2d 304, 308 [149 P.2d 281]; *Universal Sales Corp.* v. *California Press Mfg. Co.,* 20 Cal.2d 751, 764-765 [128 P.2d 665].) As in the case of other consensual relationships, the existence of a joint venture depends upon the intention of the parties. (*Lasry* v. *Lederman,* 147 Cal. App.2d 480, 486 [305 P.2d 663]; *Universal Sales Corp.* v.

*California Press Mfg. Co., supra,* 20 Cal.2d 751, 764-765.)
■ The question whether the relationship of joint venture was created was primarily a question for the trial court to determine from the facts and inferences to be drawn therefrom. (*Cutter Laboratories* v. *R. W. Ogle & Co.,* 151 Cal.App. 2d 410, 417 [311 P.2d 627]; *California Home etc. Assn.* v. *Hilborn,* 115 Cal.App.2d 634, 638 [252 P.2d 368].) ■ Words and conduct of the parties prior to, contemporaneous with, and subsequent to the point at which an agreement allegedly has been made may be examined in determining whether in fact the alleged contractual relationship was created. ■ The practical construction placed upon the agreement by the parties is, of course, substantial evidence of their intent. (See *Universal Sales Co.* v. *California Press Mfg. Co.,* 20 Cal.2d 751, 761 [128 P.2d 665]; Restatement of Contract, section 235 (e).) ■ The burden of proving the existence of a joint venture rested upon appellants. The party who seeks to recover pursuant to such an agreement must accept the burden of proof. (*Sully* v. *Kern Drilling Corp.,* 126 Cal.App.2d 651, 654 [272 P.2d 549].) ■ A finding that a joint venture did not exist, supported by substantial evidence, will not be disturbed on appeal. (*Cutter Laboratories* v. *R. W. Ogle & Co., supra,* 151 Cal.App.2d 410, 417-418.)

■ In the case at bar, the words and conduct of the parties speak eloquently in support of the trial court's factual determination that no joint venture was ever contemplated by them. Appellant Wood testified that on December 5, 1956,—prior to the time when the parties found themselves in dispute —Malcolm Lucas stated that they would have no trouble *"adjusting* the fees." Accepting Wood's testimony, the quoted statement would strongly support the inference that the "adjustment" contemplated was an adjustment of the $15,000 fee. Manifestly, such expression would not suggest any intention to change the existing relationship between the parties.

Appellant Wood also testified that he had said to Malcolm Lucas: "We ought to sit down and *readjust* our fees in this matter, in view of the subsequent happenings." When asked, on cross-examination, what he meant by the words " 'readjust' our fees," he answered, "I can't tell you at the moment, Mr. Ball, exactly what I had in mind when I used that word." It seems reasonable to infer that the words used indicated no belief in the existence of a joint venture agreement. The word "readjust" naturally suggested a change in the amount of

the agreed fee rather than a claim of right to *share* or *divide* the fee which respondents were to receive from the client.

Both appellants testified that prior to the taking of depositions in the action they had no knowledge as to what fee arrangement respondents had with the client. At no time prior to the emergence of a disagreement over appellants' demand for an adjustment of the $15,000 fee did appellants either by word or action indicate that they entertained the slightest notion that they had any vested interest in the fee contract between respondents and the client. It must have appeared to the trial court quite improbable that attorneys as experienced as appellants would enter into a joint venture entitling them to share in an existing fee arrangement without making any inquiry concerning the terms of that arrangement.

Appellants testified that in April, 1957, they asked for an adjustment of their fee—they sought a *higher* fee but they asserted no right to *share* respondents' fee. Appellant Wood testified that after the dispute concerning fees had arisen, he stated that he could not "fix a fee in fairness to you or in fairness to ourselves unless we know what your fee is." The use of the words "fix a fee" was not without significance. The court could infer that if Wood at that time thought he had any rights as a joint venturer, he would have spoken in terms of *sharing* or *dividing* the fee which respondents were to receive from the client, rather than in terms of *adjusting, fixing* or *setting* a fee. The expressions used seem quite inconsistent with a belief in the existence of a joint venture relationship— a relationship which would call for an equal division of the profits of the venture (in the absence of agreement to the contrary) regardless of the extent of participation by the respective parties.

Appellant Wood testified "I acted as spokesman from the time we came into it until I got fired." From the use of the word "fired" the trial court could infer that Wood at all times viewed his relationship with respondents as one of employment. On April 3, 1957, Malcolm Lucas said to Bunn and Wood "I want to notify you gentlement right now that we terminate your services as of this minute." Appellants made no protest, but evidently accepted the statement of Lucas as being effective to terminate the relationship. In announcing his decision, the trial judge commented that this acquiescence in respondents' power to terminate the relationship seemed inconsistent with a belief in the existence of a joint venture.

Finally, when respondent sent appellants a check for $15,-000, Bunn returned it and stated in the transmittal letter that the check did not represent the "reasonable value" of their services. From this it was reasonable for the trial court to infer that as late as a month before the complaint was filed in this action, and two months after a dispute had arisen, appellants were speaking in terms of the *reasonable value* of their services and not in terms of a right to share the emoluments of a joint venture.

Furthermore, with respect to the relationship existing between the parties, the language of appellants' amended complaint is entirely consistent with the finding of the trial court. In stating their contention in the controversy presented, appellants alleged "that for new matters arising subsequent to said original employment and involving new and different questions of fact and new and different questions of law, which plaintiffs were requested to manage, there was an agreement to pay plaintiffs *the reasonable value of their services.*" The prayer of the complaint was couched in similar language and requested that the "court determine *the reasonable value* of plaintiffs' said services." (Emphasis added.) Manifestly, this quoted language from appellants' pleading is inconsistent with their present joint venture theory.

■ The essence of appellant's position is that since they performed services additional to those contemplated by the original agreement without any new *express* agreement relative to additional compensation, it necessarily follows that there was an *implied in law* agreement creating a joint venture. In support of this position, appellants rely upon a general proposition of law that where lawyers jointly undertake to represent a client without any agreement as to the division of fees, they will be regarded as joint venturers, entitled to share equally in the fees earned by their joint efforts. (*Ford* v. *Freeman,* 40 Cal.App. 221, 227 [180 P. 545] ; *Bailey* v. *Griggs,* 174 Okla. 90 [49 P.2d 695, 697] ; *Gill* v. *Mayne,* (Iowa )162 N.W. 24, 26; *Langdon* v. *Kennedy, Holland, De Lacy & McLaughlin,* 118 Neb. 290 [224 N.W. 292, 293, 63 A.L.R. 896].)

The proposition of law advanced is unquestionably sound and valid, but it has no application in the case at bar. Here we have undisputed evidence that the relationship between the parties was that of employers and employees—a relationship established by *express* agreement. And we have most

persuasive evidence that it was the mutual intent of the parties that the same relationship should continue unchanged throughout the period of their association. As stated in *Wiltsee v. California Emp. Com.*, 69 Cal.App.2d 120, 127 [158 P.2d 612] : "There is . . . substantial authority to the effect that the relationships of employer-employee and joint adventurers are incompatible and cannot exist together between the same parties in relation to the same transaction. (*Larson* v. *Lewis-Simas-Jones Co.*, 29 Cal.App.2d 83 [84 P.2d 296] ; see note, 138 A.L.R. 968, at p. 992 et seq.) "

Thus appellants' reliance upon *Ford* v. *Freeman, supra*, 40 Cal.App. 221, 227 is entirely misplaced. As there stated: "Attorneys who jointly undertake to prosecute or defend a lawsuit are entitled, *in the absence of an agreement to the contrary*, to share equally in the compensation." (Emphasis added.) It is clear from all the authorities cited by appellants that the rule of equal division applies only where it is shown that the collaborating lawyers have not expressly or impliedly agreed otherwise. In the case at bar, as we have shown, there is ample evidence to support the trial court's finding to the effect that appellants at all times regarded themselves, and were regarded, as respondents' employees. Thus, the agreement most reasonably to be implied from the words and conduct of the parties was that appellants would be paid the reasonable value of their services.

*Deutsch* v. *Haas*, 55 Ga.App. 463 [190 S.E. 637], is a decision which deals with a factual situation very closely analogous to that of the instant case. The plaintiff in that case was a resident attorney employed by two nonresident attorneys to assist them in a bankruptcy proceeding on behalf of certain bondholders against a Georgia company which had defaulted on its obligations. Plaintiff was to do most of the preliminary work, but under the express contract between the three attorneys, he was to receive 40 per cent of the fee which might be awarded the associates for successful representation of the clients. While the matter was pending the federal bankruptcy laws were amended so as to establish procedures completely different from those in effect when the parties contracted. At plaintiff's suggestion, the defendant attorneys agreed to bring the action under this new legislation, and plaintiff continued with his preparation of the case. He ". . . spent months in preparing the case for trial, in the investigation of the facts and legal research far beyond the necessities

of the original plan; . . . [and] when the case came on for trial the local attorneys spent seventeen days in conducting the same . . ." · The case was eventually settled, and the settlement agreement provided for an award of $19,000 attorney fees. This sum was paid to defendants, who refused to pay plaintiff more than $7,600, which was 40 per cent of the $19,000 fee paid the attorneys. Upon defendants' refusal to pay more than the originally agreed sum, plaintiff filed suit for the reasonable value of his services.

The trial court found that the original contract, under which plainiff was entitled to 40 per cent of the fee ultimately recovered, was abandoned by the parties in the light of the new federal legislation which created new problems entirely different from those originally anticipated. The trial court thereupon awarded plaintiff $9,000 as the reasonable value of the services which he had rendered.

On appeal, the defendants argued that if the original contract was abandoned, then the three attorneys must have proceeded with the case as joint adventurers entitled to share equally in the fee to be recovered. It was further argued that since the parties had failed to set plaintiff's compensation, he was a joint adventurer with them and as such he was entitled to receive only one-third of the fee, or $6,333.33. In rejecting defendants' contention, the appellate court said, at page 640: ". . . under the evidence it was shown that the original contract between the parties negatived the idea of any joint adventure, and that such contract . . . was abandoned by all the parties, . . . without any agreement as to how the fees should in that case be divided between them, and that the services performed by the local attorney were different and more onerous in volume and responsibility than the work to be done under the original agreement, and under the evidence the court was authorized to find that for the services actually performed by the local attorney he was reasonably entitled to receive $9,000 out of the total amount of fees awarded jointly by the District Court of the United States. 'Ordinarily, when one renders services or transfers property valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof.' "

We must also reject appellants' argument that statements in respondents' answer that Bunn and Wood were "associated" with them and that they worked in "cooperation" and in "conjunction" with them in "counselling" and

in "representing" with them the interests of the client amounted to admissions that there was a joint venture. These forms of expression are equally consistent with the relationship which the court found to exist. Indeed, appellant Wood, in his own testimony, used the word "associated" in reference to the original relationship which admittedly was purely one of employment. Concerning respondents' acceptance of his $15,000 counterproposal, Wood testified: "The following morning Mr. Bunn advised me that Mr. Lucas had telephoned him, saying that they would like to have us *associated*."

Appellants' final contention is that the trial court's award of $40,000 must be held inadequate as a matter of law, assuming that the reasonable value of their services is the proper measure of their recovery. This argument is based very largely upon the following unwarranted assumptions of fact: (1) that appellants performed the major share of the services which accomplished the favorable result for the client; (2) that respondents ultimately will receive fees approximating $400,000; and (3) that the reasonable value of the services rendered jointly by appellants and respondents on behalf of the client was $400,000. These assumptions are not justified by the record, and, certainly, the evidence does not compel their acceptance. The client retained respondents to represent her throughout the probate proceedings. Their services began long before appellants were employed, and presumably continued long after appellants were discharged. The trial court could well have believed from the evidence, not only that respondents carried the full responsibility to the client, but also that they performed the greater part of the work in connection with the heirship proceedings and related matters. The record does not disclose the amount of the fees which respondents had received up to the time of the trial of this action. The trial court properly sustained an objection to a question designed to elicit this fact on the ground that it was immaterial.

A short but complete answer to appellants' argument, insofar as it is based on their assumption relative to the amount which respondents ultimately will receive under their contract with the client, is simply this: The reasonableness of respondents' fee contract has never been an issue in this case, and has no bearing whatsoever upon the reasonable value of appellants' services. Whether respondents ultimately would receive from the client the full amount of the fees called for by their con-

tingent fee contract was a matter of pure speculation with which the trial court in this case was in no way concerned.

There was ample evidence before the court to indicate the nature and extent of appellants' legal services and to afford a basis for determining their reasonable value. Practically all of appellants' services were rendered between October 11, 1956, and January 7, 1957, when the case was settled—a period of less than three months. Appellants gave considerable testimony concerning the nature and extent of their services. They admitted that during this period their services in connection with the estate of Crawford occupied only a portion of their professional time. Moreover, it is to be emphasized that, insofar as the client was concerned, the responsibility for the conduct of the litigation rested entirely upon respondents.

What constitutes a reasonable attorney's fee is primarily a question of fact for the trial court, and the amount awarded will not be disturbed on appeal unless an abuse of discretion is clearly shown. As stated in *State* v. *Westover Co.,* 140 Cal.App.2d 447, 450 [295 P.2d 96] : ''We are not given authority to fix a reasonable fee on appeal. . . . the appeal is not a trial de novo of the basic issue of reasonableness of the fee allowed. What constitutes a reasonable fee is and ought to be confided in the first instance to the trier of fact, the court called upon to make the allowance, and it matters not whether an appellate court sitting in review of the trial court's order finds itself in agreement with or differing from the amount so fixed. We can inquire only whether or not the sum allowed is so exorbitant that its allowance constitutes a palpable and plain abuse of discretion.''

Expert testimony as to the reasonable value of attorney's legal services is unnecessary. (*Barlin* v. *Barlin,* 156 Cal. App.2d 143, 149 [319 P.2d 87] ; *Mitchell* v. *Towne,* 31 Cal. App.2d 259, 266 [87 P.2d 908].) ''The value of attorney's services is a matter with which a judge must necessarily be familiar. When the court has been informed of the extent and nature of such services, its own experience furnishes it with every element necessary to fix their value.'' (*Spencer* v. *Collins,* 156 Cal. 298, 307 [104 P. 320, 20 Ann.Cas. 49].)

It is to be remembered that appellant Wood, in making his $15,000 counterproposal, justified his proposal by emphasizing the fact that he would expect to do his own research, to play a dominant role in settlement negotiations and to assume a considerable amount of responsibility. Hence,

the original contract of employment constituted.some evidence of the value which appellants, themselves, had placed upon their services. (*Mitchell* v. *Towne, supra,* 31 Cal.App.2d 259, 266; *cf. Oliver* v. *Campbell,* 43 Cal.2d 298, 305 [273 P.2d 15].) From the evidence in this case the trial court could very well have found that a very substantial proportion of all services which appellants rendered were rendered prior to November 20, 1956, and, hence, were within the contemplation of the original agreement. As a matter of fact, the settlement of the case relieved appellants of substantial work which would have been incident to a contested trial, work which clearly would have been within the contemplation of the $15,000 fee agreement. And a substantial part of the work actually done after November 21, 1956, could properly be regarded as having been contemplated by that agreement. The court could reasonably have found that the services which appellants performed after November 21, 1956, were of no greater value than those which they had rendered prior to that date.

The able and experienced trial judge awarded appellants two and two-thirds times the $15,000 fee which they had agreed to accept at the outset. We conclude from our review of the record that the award of $40,000 for appellants' services cannot fairly be regarded as niggardly or unreasonable. Certainly this award constituted no abuse of discretion.

The judgment is affirmed.

Fox, P. J., and Ashburn, J., concurred.

A petition for a rehearing was denied August 26, 1959, and appellants' petition for a hearing by the Supreme Court was denied September 22, 1959.