[Civ. No. 28478. Second Dist., Div. One. May 12, 1965.]

SIDNEY ROSEN et al., Plaintiffs, Cross-defendants and Appellants, v. E. C. LOSCH COMPANY, INC., Defendant, Cross-complainant and Respondent.

Thomas E. Garcin for Plaintiffs, Cross-defendants and Appellants.

Edison J. Demler and Stephen Pace for Defendant, Cross-complainant and Respondent.

LILLIE, J.—The Losch company had judgment against the Rosens and Krasik individually on its cross-complaint for its share of the profits under a written contract for the installation of gas and water systems servicing housing units at Edwards Air Base. They appeal from such judgment, contending that the subject contract was one solely between Losch and the Cabot Construction Company, and that the trial court wrongly invoked the *alter ego* doctrine in reaching its determination that appellants were joint venturers with Losch in the work to be performed under the agreement—all of the stock in Cabot, it appears, was at the time in question owned by appellants who were also officers of this latter company. There seems to be no question that Losch satisfactorily completed its performance under the agreement; too, it was stipulated at the trial that the sum eventually fixed by the court was the amount due Losch as its final share of the profits.

The grounds of appeal above stated require a summary of the background facts which, under accepted practice, must be viewed in the light most favorable to respondent.[1] In May of 1958 appellant Sidney Rosen organized Cal-Apex, Inc. which subsequently was awarded the prime contract for a multi-million dollar construction job at Edwards Air Base. Shortly thereafter Cal-Apex, a joint venture, was formed. It consisted of six corporations, including Cal-Apex, Inc., and to this joint venture the entire contract was sublet by Cal-Apex, Inc. After the joint venture was "put together," Sidney Rosen received 100 per cent of Cal-Apex, Inc., stock. A 100 per cent stock interest was also held by the sole shareholder in two of the remaining five corporate joint venturers: Macro Corp. (appellant Mac Rosen, Sidney's brother) and Berkra Corp. (appellant Krasik).

Thereafter the construction of gas and water systems was subcontracted out to Cabot, the entire ownership of which company was in the appellants as follows: Krasik, 50 per cent; the Rosen brothers, 25 per cent each. Cabot, in turn, entered into a subcontract with Losch which is the subject of this litigation. Thereunder Losch undertook to pay all labor costs and maintain payroll records; Cabot, on its part, would

---

[1]Contrary to rule 15(a), appellants' statement of facts is not supported by appropriate references to the record. In those circumstances we are entitled to accept the statements of respondent's brief as to the evidence upon the subject. (*Davis* v. *Lucas*, 180 Cal.App.2d 407, 410 [4 Cal.Rptr. 479].)

make monthly reimbursement on the basis of the net payroll disbursed by Losch. Both Losch and Cabot were prohibited from making any charge for services rendered, and both agreed to a formula representing each other's profit or loss (as the case might be) resulting from their respective engagements.

Although Cabot at the time of its acquisition by appellants had no physical assets and was capitalized for only a few hundred dollars, it was able to meet its obligations by short term loans for "temporary working capital" from three separate corporations all wholly owned by Sidney Rosen. Subsequently it undertook to acquire certain physical assets through negotiations with one Rossi, an experienced contractor who once owned his own company but was then in some financial difficulties—he was delinquent, for example, in payment of his federal income taxes. Cabot hired Rossi as its responsible managing employee (to meet licensing requirements) at a stated salary plus one-half of the company's net profits; in addition, Cabot agreed to rent or purchase Rossi's equipment. Cabot admittedly advanced large sums of money to Rossi to meet some of his more pressing liabilities; no promissory notes, however, were ever taken by Cabot to evidence this indebtedness which eventually was paid by the reduction at year's end of his share of the company's net profit.

Subsequently, in March of 1960, appellants entered into an agreement with Rossi for the transfer to him of their interest in Cabot. Letters of resignation were prepared by appellants who also endorsed their shares of stock as part of the planned transaction; all of the above items were then placed in escrow until Cabot had finished another job for which appellants were personally liable on a bond guaranteeing the job's completion. There was testimony that Sidney Rosen, acting for himself and the other appellants, prepared a statement of Cabot's assets and liabilities which showed the company to have a net worth of $44,000. Included was an item due to Losch.[2] Since it had theretofore been agreed (as part of the employment terms) that Rossi would be entitled to one-half of Cabot's stock, appellants proposed to sell their remaining interest in the company for $23,000—approximately one-half of Cabot's net worth. Payment was not to be in cash, however. It appears that among the assets owned by Cabot

---

[2]According to Rossi, Sidney Rosen stated that he (Rosen) would see that Losch was paid off, but Rossi would be responsible for the other bills.

was an account receivable from the joint venture (Cal.-Apex) in the amount of $23,000, being the final payment due under the subcontract; it was proposed that Cabot cancel this debt of the joint venture and thus leave Rossi as sole owner of Cabot's stock.

The above scheme was carried out in this fashion: Near the end of March 1960, the joint venture made its final payment to Cabot. The total sum ($23,000) was paid by three separate promissory notes, each representing percentage-wise the proportionate interest of each appellant in Cabot. Each of these notes was then endorsed by Rossi, purportedly in payment of sums due him for the purchase of his equipment. Rossi then endorsed each note separately to the order of each appellant, thus completing the purchase by him of their Cabot stock. Later that same day each appellant endorsed the note he had received back from Rossi to the corporation solely owned by him: Sidney Rosen to Cal-Apex, Inc.; Mac Rosen to Macro Corp., and Krasik to Berkra Corp. Subsequently each of these corporations endorsed the notes to the joint venture (Cal-Apex).

It is perhaps unnecessary to say that Losch never received the sums due it for work under the subcontract. After Cabot had paid off bills under another project, the corporation was left with assets totaling $9.40.

The trial court found that at the times in question Cabot was grossly undercapitalized and was a framework which appellants used as a conduit for the conduct of certain other personal business, property and affairs. It further found that Cabot was acquired by appellants, and operated by said parties, so that from time to time certain of the income, revenue, and profits of said corporation were diverted to themselves—so that if the corporate entity were to be fully recognized, individual liability might be avoided by using a financially irresponsible corporation in the place and stead of the financially responsible appellants. There was also a finding that all the work to be performed by the joint venture under its agreement with Cabot was completed, and payment in full was received by Cabot, the *alter ego* of said appellants; that there accrued to Losch as its share of the profits the sum of $15,000; that said sum was stipulated to by all the parties to this action. After declaring that a confidential relationship existed between Losch on the one hand and appellants on the other, the court found that said appellants, both as individuals and as officers and directors of Cabot, received on behalf of

said joint venture the sums due said joint venture by virtue of the work performed by it, and caused said funds so received to be deposited in a bank account under the name of Cabot Construction Company; that said Cabot Company was engaged in business enterprises additional to those set forth in the joint venture agreement, and that said funds were used to pay the bills and accounts of business other than that owed by the joint venture and for purposes other than the promotion of the interests of said joint venture and thereby deprived Losch of the $15,000 to which it was entitled. Finally, the court found that during the time appellants were officers, directors and sole stockholders of Cabot, and while the aforesaid sum of $15,000 was due and owing Losch, said appellants received and appropriated to their own use assets of Cabot in the amount of $23,000 and that as a direct result thereof Cabot was unable to pay the $15,000 due Losch.

Since the subcontract in suit is captioned "Subcontracting Agreement," the preliminary contention is made that the recitals in the instrument show on their face that a joint venture was not contemplated and, therefore, it was error for the court to construe the agreement otherwise. ▮ In support of this contention, appellants rely on the rule that a court is without power, under the guise of construction, to depart from the plain meaning of words contained in a writing (*Brant* v. *California Dairies, Inc.*, 4 Cal.2d 128, 133 [48 P.2d 13]), and insert terms or limitations not found in the writing. It must be conceded that if the language in the agreement is regarded as the sole measure of the rights and obligations of the parties, the above contention is tenable. However, this does not mean that a portion only of a written instrument, although it is clear and explicit, may be selected as furnishing conclusive evidence of the intentions of the parties. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) ▮ Provision No. 6 in the agreement refers to "any subcontractor . . . hereunder," in spite of the fact that there could have been only one specific so-called subcontractor within contemplation of the contracting parties. The above provision in itself resulted in a measure of uncertainty and ambiguity which warranted the court applying the familiar rule that when a contract is ambiguous a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and

will, when reasonable, be adopted and enforced by the court. (*Work* v. *Associated Almond Growers*, 102 Cal.App. 232, 235 [282 P. 965].) The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention. In this connection, the question was put to Sidney Rosen on cross-examination as to the relationship of Losch and Cabot: "Q. Cabot Construction Company, Inc., a corporation, also let out a subcontract to the Losch Company, isn't that true? A. No, I don't think so, they formed a joint venture with the Losch Company to do the water and gas." *Bunn* v. *Lucas, Pino & Lucas*, 172 Cal.App.2d 450, 461-462 [342 P.2d 508]: "As in the case of other consenual [*sic*] relationships, the existence of a joint venture depends upon the intention of the parties. [Citations.] The question whether the relationship of joint venture was created was primarily a question for the trial court to determine from the facts and inferences to be drawn therefrom. [Citations.] Words and conduct of the parties prior to, contemporaneous with, and subsequent to the point at which an agreement allegedly has been made may be examined in determining whether in fact the alleged contractual relationship was created. The practical construction placed upon the agreement by the parties is, of course, substantial evidence of their intent."

 Reference to the testimony of Sidney Rosen, of course, disposes of the additional claim by appellants that no testimony was introduced on behalf of either party to show the intent of the parties in making the contract. In this regard appellants say: "As a matter of fact, there were no witnesses at all on behalf of Losch other than plaintiff Sidney Rosen who was examined under C.C.P. 2055." Such testimony could, and presumably was considered by the trial court in this determination of this phase of the case, even though the testimony was forthcoming under the circumstances above set forth.

Finally, as to this preliminary point, appellants argue that where an agreement is given a label, that label or designation, standing by itself, is the strongest possible evidence as to the relationship which the parties themselves intended. This, of course, goes back to the initial claim that the contract speaks for itself. However, "The nature of the instrument is

not to be determined by what the parties called it. [Citation.] Its nature is to be determined by its legal effect.'' (*Smith* v. *Grove*, 47 Cal.App.2d 456, 461 [118 P.2d 324]; see, also, *Epstein* v. *Stahl*, 176 Cal.App.2d 53, 57 [1 Cal.Rptr. 143].)

It is next contended that a reading of the plain language of the agreement does not disclose all of the elements necessary to constitute a joint venture. The parties agree that there are certain elements common to a joint venture agreement which afford objective evidence of the parties' intent. Among these elements are the following: (1) A single enterprise; (2) a sharing of profits and losses; (3) a community of interest; and (4) joint control of the undertaking. Appellants assert an absence of joint control under the undertaking in suit, pointing out that different obligations were assumed by each of the contracting parties. Thus, Cabot agreed to supply all bonding requirements in connection with the job; by so undertaking to become financially responsible for work to be performed by another party, it naturally had a greater interest than is usual in such cases in seeing that the work was properly done. Losch, on the other hand, was to contribute its experience in the installation of water and gas systems; to that end, according to the agreement, Losch committed itself to be fully responsible and liable for the performance of the contract. ▮ But there may be joint participation in the management and control of a joint venture where the contributions of the respective parties to the enterprise are unequal and not of the same character. (*James* v. *Herbert*, 149 Cal.App.2d 741, 748 [309 P.2d 91].) ▮ Too, although joint control of the undertaking and equal power to direct the enterprise is an essential element of a joint venture, ''this is not to say that there cannot be a joint venture where the parties have unequal control of operations.'' (*Stilwell* v. *Trutanich*, 178 Cal.App.2d 614, 619 [3 Cal.Rptr. 285].) In the case just cited, it was held that there could be such joint control between a seafood company and a vessel owner on a single ocean voyage in spite of the fact that the seafood company had no right to direct their coadventurers in the making of the voyage. Similarly in *Oakley* v. *Rosen*, 76 Cal.App.2d 310 [173 P.2d 55], it was held that an agreement under which one party was to produce a play and the other party to provide merely the necessary finances, and there was to be a sharing of any profits, a joint venture was created, ''Because it does not differ . . . from joint ventures for mining, building, promotion and other undertakings, . . .'' (P. 313.)

With respect to the existence of the remaining elements mentioned above, the record substantially supports the determination that such elements were here present; that being so, our responsibility as a reviewing court has been accomplished. ▋ Thus, Provision No. 3 refers to "a single job" in the keeping of records, which would indicate that the venture was *a single enterprise.* ▋ The agreement also details provisions for the sharing of *profits and losses,* and the element of *community of interest* is reflected by provisions in the agreement. Losch would provide equipment, skill and labor, while Cabot furnished the necessary money—all to the common end of completing the project. Appellants in fact concede that one or more of these elements are present but return to the argument that the really crucial element, joint participation in the control of the business, is lacking. We have heretofore made an adverse determination in that regard and accordingly pass to the next and final assignment of error.

It is contended that the court erroneously applied the doctrine of *alter ego* to impose personal liability upon appellants. They say that Losch, being a corporation, knew it was doing business with another corporation; that appellants in good faith conducted a separate business enterprise through a corporation and should not be called upon to respond personally simply because it would appear that the corporation may be unable to do so. The parties are again in agreement as to the controlling law but differ in the application of such law to the facts at bar. ▋ When the doctrine of *alter ego* is invoked, one element always present is the unity of interest between the corporation and its shareholders. (*Automotriz etc. De California* v. *Resnick,* 47 Cal.2d 792, 796 [306 P.2d 1, 63 A.L.R.2d 1042].) Numerous cases hold that the above element is established upon a showing of close ownership and control of the entire organizational framework. (*Associated Vendors, Inc.* v. *Oakland Meat Co.,* 210 Cal.App.2d 825 [26 Cal.Rptr. 806].) ▋ In the instant proceeding, as already noted, appellants were the sole shareholders, officers and directors of the corporation. In addition, they held interests in the corporations with which Cabot was doing business, so that it may not be said that Cabot was dealing at arm's length with such companies.[3]

---

[3] When Sidney Rosen presented the $23,000 note for endorsement by Rossi, he stated to the latter that "he would take off his Cabot hat and become Cal-Apex . . . ."

334

■ Another factor is the undercapitalization of the entity. (*Minton* v. *Cavaney*, 56 Cal.2d 576 [15 Cal.Rptr. 641, 364 P.2d 473].) The record discloses that Cabot was purchased by the appellants in 1954 for $856, and never thereafter received additional capital contributions. In 1958, nevertheless, it entered into a $200,000 subcontract under a $11,000,000 prime contract. Appellants argue that the company was never insolvent, at least until after it was sold to Rossi; that "undercapitalization" is not a synonym for "insolvency." If the corporation remained solvent, it did so due to the financial assistance received from Sidney Rosen through the latter's wholly owned companies for "temporary working capital." The trial court could properly deduce from the foregoing state of facts that appellants, as owners of the corporation, should be held personally liable to parties injured through the use of such business devices which, viewed objectively, constituted an abuse of the corporate privilege.

The decisions likewise hold that personal liability will attach when the corporation is rendered insolvent due to the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another. (*Riddle* v. *Leuschner*, 51 Cal.2d 574 [335 P.2d 107]; *Talbot* v. *Fresno-Pacific Corp.*, 181 Cal.App.2d 425 [5 Cal.Rptr. 361].) In this connection, as shown above, it is undisputed that the funds realized from the $23,000 note transaction were ultimately transferred to personal corporations entirely owned by these appellants. Finally, it is held in *Riddle* v. *Leuschner*, *supra*, page 581, that failure of the corporation to maintain accurate minutes of its meetings is still another factor which may be relied upon to disregard the corporate entity. It appears, again without dispute, that the substantial advances to Rossi were made without any meeting of Cabot's directors.

■ In the last analysis, as in the instance of the previous assignment of error, the determination of the existence of all these factors is primarily one for the trial court and its conclusion will not be disturbed if supported by substantial evidence. (*Associated Vendors, Inc.* v. *Oakland Meat Co., supra*, p. 837.) That is the situation at bar.

■ A second basic requirement for invoking the *alter ego* doctrine is the promotion of injustice if the corporate entity is not disregarded (*Automotriz etc. De California* v. *Resnick*, *supra*, 47 Cal.2d 792, 796); but bad faith in one form or another should first be shown. (*Luis* v. *Orcutt Town Water Co.*, 204 Cal.App.2d 433, 443-444 [22 Cal.Rptr. 389].) Bad faith,

manifestly, is the complete opposite of good faith. The parties to the subject transaction being joint venturers, each owed to the other the utmost good faith (*MacIsaac* v. *Pozzo,* 26 Cal.2d 809, 813 [161 P.2d 449]) and each was accordingly required to refrain from taking any unfair advantage of his coadventurer. The fact that Losch was eventually placed in the position of a general creditor despite Sidney Rosen's admission (to Rossi) that respondent was entitled to its money does not evidence compliance with the above principle of partnership law—and the law makes no distinction in this regard between partners and joint venturers. Too, the nature of the title of a joint venturer in the assets of the venture is akin to that of the beneficiary of a constructive trust. (*Jaffe* v. *Heffner,* 173 Cal.App.2d 512, 516 [343 P.2d 374].) It follows that part of the monies appellants obtained for the transfer of their interests in Cabot were assets that should have been retained for Losch's benefit.

For the foregoing reasons, the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.