255 F.2d 137
 UNITED STATES of America, for the Use and Benefit of HOPPER
BROS. QUARRIES, a partnership, Appellant,
v.
PEERLESS CASUALTY COMPANY, a Corporation, and Bill Curphy
Company, a Corporation, Appellees.
 No. 15852.
 United States Court of Appeals Eighth Circuit.
 April 28, 1958, Rehearing Denied May 21, 1958.
 
 Herman Ginsburg, Lincoln, Neb. (Hymen Rosenberg, Joseph Ginsburg, Lincoln, Neb., and Elmer F. Witte, Pawnee City, Neb., on the brief), for appellant.
 John H. Neiman of Neiman, Neiman & Stone, Des Moines, Iowa (Robert A. Barlow of Healey, Davis, Wilson & Barlow, Lincoln, Neb., on the brief), for appellees.
 Before SANBORN, WOODROUGH, and VOGEL, Circuit Judges.
 WOODROUGH, Circuit Judge.
 
 
 1
 This action was brought under the Miller Act, 40 U.S.C.A. 270a(a)(1, 2) and 270b(a), against the prime contractor for surfacing levees in the Omaha Levee System, and its payment bondsman to recover $10,000.02 due and owing the use plaintiff (referred to as plaintiff) on account of 6,014.2 tons of crushed rock supplied by it to the subcontractor, Leonard M. McDonald, d/b/a Omaha Rock and Excavating Company, and used on the work. The plaintiff was entitled to recover in the action if it had met the requirements of section 270b in respect to giving notice ot the prime contractor within ninety days from June 16, 1953, when the last of the material was supplied. The District Court decided on the trial without a jury that the notice relied on by plaintiff was insufficient and dismissed the action on that ground. The plaintiff appeals.
 
 Statement
 
 2
 It appears that the contract between the prime contractor and the sub-contractor called for the latter to furnish some 10,300 tons of the rock and that he purchased 6,014.2 tons of it from plaintiff. It was used on the work between May 19, 1953 and June 16, 1953, the agreed price and value being $10000.02. On June 16, 1953, thirty days after the last material was received on the work, the contractor settled with the subcontractor and paid him in full for all sums due him under his contract without inquiring of him whether he had paid for the material he used on the work. The plaintiff attempted without success to obtain payment from the subcontractor who was subsequently adjudged bankrupt with nothing for general creditors. On August 6, 1953, 51 days after plaintiff's last delivery of the material, plaintiff wrote, signed and mailed the following letter to the prime contractor:
 
 
 3
 'Hopper Bros. Quarries
 
 Lime and Rock Products
 Phone 2581
 Pawnee City, Nebraska
 August 6, 1953
 
 4
 'Bill Curphy Contracting Co.;
 
 
 5
 Des Moines, Iowa.
 
 
 6
 'Attention Mr. Curphy
 
 
 7
 'We Hopper Brothers furnished Omaha Rock Ex. Co. 60142 Tons of rock in the months of May and June, for The Corps of Engineers, Omaha Levee Surfacing No. 1 Levee Project, with you Mr. Curphy the Prime Contractor.
 
 
 8
 'We are unable to collect for this rock, will you give us information as to why this bill is not paid?
 
 
 9
 'Truly yours, Raymond Hopper, Hoppers Brothers.'
 
 
 10
 The actual amount of the rock furnished was 6,014.2 tons and the omission of the decimal point in the letter was as a result of a misprint or error.
 
 
 11
 In reply to the above letter, the contractor wrote plaintiff:
 
 
 12
 'Bill Curphy Co.
 
 
 13
 Contractors . . . 447 Insurance Exchange Building Des Moines 9, Iowa Telephone 8-0194 'August 7, 1953
 
 
 14
 'Hopper Bros. Quarries
 
 Pawnee City, Nebraska
 
 15
 'Attention: Raymond Hopper
 
 
 16
 'Gentlemen:
 
 
 17
 'After receiving your letter this morning we called Mr. McDonald of Omaha Rock & Excavating Co. regarding your unpaid bill for rock placed on the Omaha Levee for which we had the prime contract.
 
 
 18
 'He stated that there is some disagreement over the rejection of some 500 tons of rock but that if you would come in and talk to him he would be glad to settle with you. He said that he had talked to you by telephone several times but that you were reluctant to discuss the adjustment for the rejected rock. We are not familiar with the dispute but would suggest that you drop in to see him and try to work out a settlement to your mutual satisfaction.
 
 
 19
 'He has been notified that unless he settles with you immediately the matter will be turned over to his bonding company.
 
 
 20
 'Very truly yours, Bill Curphy Co. Glen Lange (s) Glen Lange Assistant Secretary
 
 
 21
 'cc: Anton, Hammond
 
 
 22
 Dunn, Inc.'
 
 
 23
 Anton, Hammond, Dunn, Inc., of Des Moines, Iowa, referred to in the lower left hand corner of the above letter, as having a copy of the letter sent to it, is the agent which wrote the payment bond sued on for the defendant Peerless Casualty Company and countersigned the same. It also wrote the contractor's performance bond furnished by the same casualty company and both a payment and a performance bond of the Merchants Mutual Bonding Company given by the subcontractor, McDonald, to the prime contractor.
 
 
 24
 Raymond Hopper, one of the partners of plaintiff, testified that on August 8, 1953, while the witness was at the rock quarries he received a telephone call from a party who stated that he was a representative of the bonding company. The following Tuesday the witness received another long distance telephone call from the same party. On Monday, August 10th, following the first telephone call, the witness went to Omaha and contacted Mr. McDonald, the sub-contractor; and in the second call which the witness received on Tuesday, the party calling made reference to the conversation which the witness had had with Mr. McDonald on the Monday precedng. The party calling on Tuesday wanted to know how the witness had come out when he talked to McDonald, and the witness told this party that he had agreed to deduct $600.00 from the amount due, and to settle for $10,000.00 which was to have been paid that day. McDonald did not pay then, but agreed to pay within a week or ten days; and the witness so reported to the person calling him over the telephone. This party then told the witness that if the witness did not receive the money shortly, the witness should let him know. This conversation occurred on August 11, after the witness had talked to Mr. McDonald on August 10th. The party with whom the witness talked on August 11 had the same voice as the party who had called the witness the preceding Saturday, August 8th. The call came from Des Moines.
 
 
 25
 When the call was made to the witness on August 8th, the party calling wanted to know if the witness had received any payment on the rock which he had delivered, and the witness told him that he had not, and the party then wanted to know why. The witness told the party inquiring that he did not know why, but that he would go to Omaha on Monday and look up McDonald and find out what had happened. In that conversation the party calling stated that he was a representative of the bonding company, and inquired as to the amount due the plaintiff, and the witness told the party calling that the amount was $10,600.02 and that party then told the witness that he understood that there was a controversy over some of the material, and that was the reason McDonald was withholding payment. In that conversation the party calling told the witness that he had been notified by the contractor that it had received a letter from plaintiff to the effect that plaintiff had not been paid and was making demand for payment.
 
 
 26
 During the latter part of August, Mr. Glen Lange, Assistant Secretary of the contractor, called plaintiff and talked to Mr. Raymond Hopper by long distance. He told Raymond Hopper that he had just spoken to McDonald in Omaha, and McDonald had advised Mr. Lange that he, McDonald, had settled with Hopper Brothers and he wanted to verify the statement. Raymond Hopper said he had come to an agreement with McDonald as to the amount owing and McDonald had promised to pay by a certain time. Glen Lange told Raymond Hopper to let the contractor know if McDonald did not pay and they would try to help him.
 
 
 27
 Plaintiff's further attempts to collect from McDonald proved unsuccessful, and on October 28, 1953, after the ninety day period had passed, plaintiff sent the following letter, which was received by contractor on October 29, 1953:
 
 
 28
 'October 28, 1953
 
 
 29
 'Mr. Glen Lange
 
 Bill Curphy Company
 447 Insurance Exchange Bldg
 Des Moines 9, Iowa
 
 30
 'Dear Mr. Lange:
 
 
 31
 'Upon receipt of your letter of August 7, 1953, we contacted Mr. McDonald and agreed upon a settlement for the rejected rock. We agreed on $600.00, which would leave $10,000.02 due. Mr. McDonald agreed to pay this account within a week to ten days, but we have not received a penny. We have contacted him a number of times since but all he does is make promises.
 
 
 32
 'We have found that he does not keep his promises. We would like for you to notify the Bonding Company that this account still remains unpaid. We would also like to have the name and address of the Bonding Company.
 
 
 33
 'Very truly yours, Hopper Bros. Quarries Raymond Hopper, Active Partner'
 
 
 34
 On October 29, 1953, Anton, Hammond, Dunn, Inc. transmitted the following letter to the sub-contractor:
 
 
 35
 'Mr. L. McDonald
 
 
 36
 Omaha Rock & Excavating Co.
 
 3424 L. Street
 Omaha, Nebraska
 
 37
 'Hopper Bros. Quarries Bill
 
 
 38
 'Dear Mac:
 
 
 39
 'Bill Curphy Co., has turned over to us a letter received October 28, 1953 from Hopper Bros. pointing out that you owe them on apparently the Omaha Levee job for rock furnished $10,000.02.
 
 
 40
 'Hopper Bros. state that this bill was to have been paid as per your agreement some ten days after arbitration as to the correct amount.
 
 
 41
 'Possibly you don't understand Mac, that if this bill is due and if its for rock furnished on the Omaha Levee, and if it is not paid immediately, we will have no recourse but to immediately tie up your assets as follows:
 
 
 42
 '1. All assets of Omaha Rock & Excavating Co.
 
 
 43
 '2. All personal assets of L. McDonald.
 
 
 44
 'This is harsh action, but your Surety Company has first legal rights to your assets under the indemnity agreement on the bond application wherein you have agreed both from a Company standpoint and personally to indemnify and hold the Surety free from any loss under the bond.
 
 
 45
 'We are sending a copy of this letter to Mr. Raymond Hopper and instructing him to let us know by Friday, November 6, 1953, whether or not you have settled this matter. In the event you have not we will at that time have legal action started to protect the Surety's interest.
 
 
 46
 'Very truly yours, O. W. Hammond.'
 
 
 47
 A carbon of the foregoing letter was transmitted to, and received by plaintiff, with the following pencil notation at the top of it:'Mr. Hopper, let me know by Friday, November 6th, what McDonald is doing.
 
 
 48
 'Anton, Hammond, Dunn, Inc.
 
 
 49
 214 Walnut Bldg.
 
 
 50
 Des Moines, Iowa.'
 
 
 51
 On November 6, 1953, Hopper Brothers Quarries advised Anton, Hammond, Dunn, Inc. that MdConald had not been heard from and could not be contacted.
 
 
 52
 On April 23, 1954, this action was instituted by the United States for the use of Hopper Bros. Quarries against Bill Curphy Company and Peerless Casualty Company.
 
 Opinion
 
 53
 The Miller Act, after first providing that one who furnishes material under contract to a prime contractor on federal construction work may sue on the contractor's bond, then provides:
 
 
 54
 'Provided, however, That any person having direct contractual relation with a subcontractor but no contractual relationship expressed or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond, upon giving written notice to said contractor within ninety days from the (last) date on which said person did or performed the last of the labor furnished or supplied, the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed.
 
 
 55
 'Such notice shall be served by mail, postage prepaid, in an envelope mail, postage prepaid, in an enelope addressed to the contractor at any place he maintains an office or conducts his business, or his residence, or in any manner in which the United States Marshal of the district in which the public improvement is situated is authorized by law to serve summons.'
 
 
 56
 In this case the plaintiff had a contract with the subcontractor but no direct contract with the prime contractor and the following clauses of the proviso of section 270b(a) were therefore applicable:
 
 
 57
 '(1) (Such materialmen) shall have a right of action upon the said payment bond upon the giving of written notice to said contractor within ninety days * * * (2) stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished * * * (3) such notice shall be served by mailing the same by registered mail * * *.'
 
 
 58
 Under the circumstances of this case the plaintiff's letter to the contractor of August 6th, 1953, received by the contractor the next day and answered on the day following, must be deemed a giving of written notice by the materialman to the contractor. The contractor accepted it as such and in accordance with it notified Anton, Hammond, Dunn, Inc., that the plaintiff materialman had not been paid by the sub-contractor and was making demand for payment. Although part of plaintiff's letter of August 6th is worded in the form of an interrogatory, it is plain enough from the language used that the writer had turned fro the delinquent sub-contractor to the contractor to let it know that the writer wanted the money that was owing to it and was giving notice to the contractor to that that the writer had turned from the delinquent
 
 
 59
 The next provision of section 270b is that the notice state with substantial accuracy the amount claimed and to whom the material or labor was furnished. The notice of the letter was explicit that the material was furnished to the named sub-contractor of the named prime contractor and was not paid for notwithstanding the lapse of 51 days after the last delivery, but it did not state the amount of the claim either in dollars and cents or in quality of materials with substantial accuracy.
 
 
 60
 The typographical error in leaving out the decimal point between the 4 and the 2 in the figure 60142 tons contained in the letter of August 6th has not been extensively argued as a defense. The total amount of rock in the job was only 10300 tons and it was probably unlikely that plaintiff's deliveries would amount to an even figure with no fraction. The record does not indicate that the matter was ever mentioned in any of the conferences of the parties and the District Court did not rest the judgment for the defense upon it. We hold it did not constitute a defense to the action and we will discuss particularly the defect of the notice as to the amount of the claim.
 
 
 61
 The third requirement of the proviso of section 270b, that the notice be sent by registered mail or in the manner in which the marshals are authorized to serve summons, waa likewise not complied with. Plaintiff's letter was sent in the ordinary course of mail, but it was received by the contractor and answered by it in the same course of mail and the Supreme Court firmly settled, in Fleisher Engineering & Construction Co. v. United States, 311 U.S. 15, 61 S.Ct. 81, 83, 85 L.Ed. 12, that the materialman's right to sue should not be denied in that situation for failure to comply with the prescribed manner of giving the notice to the contractor. 'In the face of such receipt, (of notice by the contractor) the reason for a particular mode of service fails. It is not reasonable to suppose that Congress intended to insist upon an idle form.' Ibid.
 
 
 62
 The narrow question in this case is, therefore, whether the court must deny to plaintiff the pay for the materials it furnished on the work because of the failure of the written notice, which the plaintiff timely mailed to the contractor, to state on its face 'with substantial accuracy' the dollars and cents that plaintiff claimed.
 
 
 63
 It may be that Congress thought the procedural requirements it prescribed for laborers and materialmen to enforce the right to sue for their pay which is accorded them by the Miller Act were so plain, simple, and easy to comply with that there would seldom be questions about them. But experience is to the contrary and the courts are continually called on to determine whether one deviation or another from the strict letter of the Act necessitates denial of the protection to laborers and materialmen, which the Act aims to provide. The doctrine to which the courts are unanimously committed is that the protection of the laborers and materialmen is the dominant purpose of the Act and a liberal construction of its procedural provisions must be resorted to when necessary to effectuate that purpose. United States for Benefit and on Behalf of Sherman v. Carter, 353 U.S. 210, 217, 77 S.Ct. 793, 1 L.Ed.2d 776.
 
 
 64
 Many years ago the Supreme Court declared in an action on a contractor's bond:
 
 
 65
 'Decisions of this court have made it clear that the statute and the bonds given under it must be construed liberally, in order to effectuate the purpose of Congress declared in the act. In every case which has come before this court where labor and material were actually furnished for and used in part performance of work contemplated in the bond, recovery was allowed, if the suit was brought within the period prescribed by the act. Technical rules otherwise protecting sureties from liability have never been applied in proceedings under this statute.' Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 380, 37 S.Ct. 614, 616, 61 L.Ed. 1206.
 
 
 66
 The declaration was related to an earlier Act than the Miller Act, but the intention of the Miller Act was to strengthen and not to weaken the protection which both Acts intended to provide to laborers and materialmen.
 
 
 67
 As applied to the present case, a first inquiry suggests itself whether a construction of the statute holding plaintiff entitled to recover notwithstanding the omissions from its written notice would cause injustice to or be inequitable to the contractor or his surety.
 
 
 68
 Undoubtedly the requirement of a notice to the contractor during the ninety day period is for the benefit of the contractor and the surety and it may enable the contractor to save himself and his surety by withholding payments from a delinquent sub-contractor until his laborers and materialmen have been satisfied or by taking other steps to protect themselves. But in this case the contractor had paid the sub-contractor in full without awaiting the expiration of the ninety day period, the sub-contractor's bankruptcy followed upon repossession of his assets, and there is nothing in the record to justify an inference that any defect in form in the plaintiff's notice to the contractor of its unpaid bill was material to any right of the contractor or of the surety. The contractor became informed from plaintiff's letter on receiving it that the plaintiff had an unpaid account for which the contractor was liable under the Miller Act.
 
 
 69
 The undisputed facts as outlined also show clearly that conduct of the contractor and its surety deterred the plaintiff from amplifying the written notice of its unpaid bill for material set forth in the letter of August 6, 1953, as to the details now in question. When it received the letter, the contractor not only treated it as a demand for payment, as has been stated, but it also assumed to give an answer to the interrogatory contained in the letter 'as to why this bill is not paid?', following the declaration 'we are unable to collect for this rock'.
 
 
 70
 It is obvious that an ingenuous and truthful answer by the contractor would have included the information that the contractor itself and the contractor alone was obligated under the law to pay for the rock if as plaintiff stated, it 'was unable to collect' for it from the subcontractor. If the contractor had acknowledged and paid the debt it could have recouped in full from the sub-contractor's bond.
 
 
 71
 But in the letter the contractor sent plaintiff on August 7, 1953, purporting to answer plaintiff's interrogatories of August 6, 1953, the fact that the contractor was obligated to pay the plaintiff's bill is omitted and the intendment and implication of the contractor's letter is that there is some bonding company to which the contractor can and will turn over the plaintiff's claim upon which the plaintiff can depend for payment. The contractor conveys this assurance to the plaintiff that 'unless he (the sub-contractor) settles with you immediately the matter will be turned over to his bonding company'.
 
 
 72
 Immediately following the contractor's letter of August 8, and on August 10th and 11th, Anton, Hammond, Dunn, Inc. called upon the plaintiff, identified itself with the contractor's letter, ascertained the exact amount that was due the plaintiff for the rock furnished on the work and that the amount was agreed upon and unpaid and confirmed that it was the one that should be contacted if plaintiff did not receive its money shortly.
 
 
 73
 Plaintiff's acquiescence in the contractor's holding out of a bonding company to pay the bill unless the sub-contractor 'settles * * * immediately' was indicated in plaintiff's letter to the contractor of October 28, 1953 (after the lapse of the ninety day period) in which plaintiff stated:
 
 
 74
 'We would like for you to notify the Bonding Company that this account still remains unpaid. We would also like to have the name and address of the Bonding Company.'
 
 
 75
 But there was in truth and in fact no such bonding company for the plaintiff to look to for payment. It was provided in the payment bond given to the contractor by the sub-contractor that:
 
 
 76
 'No right of action shall accrue on this bond to or for the use of any person or corporation other than the contractor (Bill Curphy Co.) named herein or the heirs, executors, administrators or successors of the contractor.'
 
 
 77
 The only one plaintiff had the right to look to therefore when it made inquiry of the contractor in its letter of August 6th 'for information as to why this bill is not paid' was the contractor. It is the intendment and purpose of the Miller Act to put that obligation upon the contractor and upon the bonding company as surety for it.
 
 
 78
 It may well be that neither the contractor nor the surety was required to hunt up the materialman even after it received notice that there was an unpaid bill due for rock delivered on the work to make any declaration of their obligation to pay the bill. But here the materialman made th direct inquiry of the contractor and the contractor voluntarily gave an answer and identified the surety with itself in the answer.
 
 
 79
 The inevitable effect of the answer so volunteered by the contractor was to prevent plaintiff from taking advice or adding anything to the written notice of the claim which it had given to the contractor in its letter. Plaintiff had reason to believe that the contractor found the written notice sufficient and it would be unconscionable to permit the contractor and the bondsman to escape their just obligation to pay because of any deficiency in what was, under the circumstances, a matter of form, and that deficiency in form was attributable to their own conduct. There can be no claim that any substantial right of any of the parties was in any degree affected by the omission from the written notice of the dollars and cents due and the defendants in this action are plainly estopped to defeat recovery on that ground. To hold otherwise would be to exalt form over substance and frustrate the purpose for which the Act was passed.
 
 
 80
 The cases in which the federal courts are called on to accord liberal construction of section 270b in order to prevent such frustration are very numerous. Scarcely a volume of federal reports goes to press without an instance of it. But the determination of the Supreme Court to adhere to its doctrine of liberal construction to prevent such frustration is reiterated in the recent case of United States for Benefit and on Behalf of Sherman v. Carter, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776, decided April 29, 1957, after the entry of judgment here appealed from.
 
 
 81
 That case concerned the extent of the liability on a payment bond furnished by a contractor as required by the Miller Act for the protection of persons supplying labor for the construction of federal public buildings. The collective-bargaining contract under which the laborers were hired obligated the contractor to pay them wages at specified rates and in addition to pay 7 1/2 cents an hour to the trustees of a health and welfare fund established for their benefit and that of other construction workers. The trustees of the fund sued to recover an amount claimed under the 7 1/2 cents an hour provision of that contract and the defense was that the Act did not cover the claim and the Court of Appeals for the Ninth Circuit so held. 229 F.2d 645, 647. It observed that recovery on a Miller Act bond is limited to persons who have 'furnished labor or material in the prosecution of the work provided for in such contract.' and that there was 'no contention that these appellants * * * furnished labor or material in the prosecution of the work provided for in said contracts,'. But the Supreme Court declared:
 
 
 82
 'The Miller Act represents a congressional effort to protect persons supplying labor and material for the construction of federal public buildings in lieu of the protection they might receive under state statutes with respect to the construction of non-federal buildings. The essence of its policy is to provide a surety who, by force of the Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material. Thus the Act provides a broad but not unlimited protection.' 353 U.S. 210, 216-217, 77 S.Ct. 793, 797.
 
 
 83
 The Court cited Clifford F. MacEvoy Co. v. United States, 322 U.S. 102, 107, 64 S.Ct. 890, 88 L.Ed. 1163, and extending prior liberal constructions of the Miller Act and the predecessor Heard Act, the Court held that the Miller Act covered the delinquent contributions to the trustees of the health and welfare fund.
 
 
 84
 When the facts in the case at bar are considered in comparison with the facts and the decision of the Supreme Court in the Carter case, it is clear that the plaintiff here may not be denied recovery compatibly with that decision.
 
 
 85
 The precise point is not the same in the cases, but in both the court is called on to decide whether to adhere strictly to the letter of the Act or by liberal construction to enforce its purpose to have the obligations of a defauling sub-contractor to suppliers of labor and material made good.
 
 
 86
 As to the case at bar, the Act prescribes details to be put into a notice; in the Carter case it specified persons who had furnished labor or material in the prosecution of the work. In both cases the purpose of the Act can only be enforced by liberal interpretation of the language used.
 
 
 87
 The appellees here have relied heavily upon the decision of this Court in United States v. Northwestern Engineering Co., 8 Cir., 1941, 122 F.2d 600. We there denied recovery to a materialman suing under the Miller Act because it had completely failed to give any notice of its claim to the contractor within ninety days from the last delivery of materials on the work within the requirement of 270b. By that failure it had deprived the contractor of a right accorded by Congress. That decision has been frequently cited and followed, but may not control decision in the present case where the timely written notice that was given caused the contractor to immediately contact the sub-contractor and talk to him about the unpaid bill and caused the contractor to write the materialman about the same matter. Also, it resulted in the insurance agency's calling the plaintiff about it on the several occasions, and led to the contractor's officer interviewing both the sub-contractor and the plaintiff about it-- all within the ninety day period.
 
 
 88
 We think the following additional casses decided under the Miller Act tend to support our conclusion: Equitable Surety Co. v. United States to the use of McMillan & Sons, 234 U.S. 448, 34 S.Ct. 803, 58 L.Ed. 1394; Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206; Houston Fire & Casualty Ins. Co. v. United States, 5 Cir., 217 F.2d 727; Coffee v. United States, 5 Cir., 157 F.2d 968; Glassel-Taylor Co. v. Magnolia Petroleum Co., 5 Cir., 153 F.2d 527; Foley v. United States Fidelity & Guarantee Co., 2 Cir., 113 F.2d 888; Bowen v. Mt. Vernon Savings Bank, 70 App.D.C. 273, 105 F.2d 796; United States v. Wood, 4 Cir., 99 F.2d 80; United States v. Kickstein, D.C., 157 F.Supp. 126; United States v. Kagen, D.C., 129 F.Supp. 331; United States v. Maryland Casualty Co., D.C., 64 F.Supp. 522.
 
 
 89
 We conclude that the trial court erred in dismissing the action. The judgment is reversed with direction to enter judgment for plaintiff in accordance herewith.
 
 
 90
 Reversed and remanded with direction to enter judgment for plaintiff.
 
 
 91
 SANBORN, Circuit Judge (dissenting).
 
 
 92
 I am in complete accord with the conclusion of Judge Delehant that the letter of August 6, 1953, from Hopper Bros. Quarries to the prime contractor, Bill Curphy Company, as supplemented by the telephone conversations of August 8 and August 11, 1953, with the agent of the surety on the contractor's payment bond, did not meet the notice requirement of the Miller Act.
 
 
 93
 This Court in United States v. Northwestern Engineering Co., 122 F.2d 600, 602, unquestionably held that the giving of a written notice to the general contractor, on a public work, of an unpaid claim for material furnished a subcontractor, stating with substantial accuracy the amount claimed, 'must be held to be mandatory, as a strict condition precedent to the existence of any right of action upon the payment bond.' As was pointed out in that case, the right of a materialman to recover upon such a bond is purely statutory, and 'Congress necessarily could impose such creating conditions as it saw fit.'
 
 
 94
 I do not understand how a letter to the contractor, stating no claim for any amount, plus some telephone conversations with the agency of the contractor's surety, could constitute the giving of the written notice required by the Miller Act. Concededly the Miller Act is entitled to a liberal construction, but not so liberal, I think, as to amount to amending or emasculating the requirement of the giving of the statutory written notice. Compare, Clifford F. MacEvoy Co. v. United States, 322 U.S. 102, 107, 64 S.Ct. 890, 88 L.Ed. 1163.
 
 
 95
 I would affirm.