The **UNITED STATES OF AMERICA for the Benefit and Use of EPC Corporation, an Arizona corporation,** Plaintiff,

v.

**TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA, et al.,** Defendant.

Nos. 02–2313 PHX ROS, 03–0131 PHX ROS, 04–1360 PHX ROS.

United States District Court, D. Arizona.

March 21, 2006.

Hank E. Pearson, Jay Max Mann, Mann Berens & Wisner LLP, Kevin R. Harper, Dessaules Harper PLC, Phoenix, AZ, for Plaintiff.

Jeffrey L. Shields, Zachary T. Shields, Callister Nebeker & McCullough, Salt Lake City, UT, Chad L. Schexnayder, James L. Csontos, William F. Haug, Jennings, Haug & Cunningham LLP, Phoenix, AZ, for Defendant.

## OPINION AND ORDER

SILVER, District Judge.

This case consists of three separate actions that were consolidated in July 2004. All of the actions stem from a construction contract involving a facility at Grand Canyon National Park. There are currently three Motions for Partial Summary Judgment pending before the Court. (Doc. 87, 89, 91) This Order resolves all three of those motions.

## BACKGROUND

In March 2001, Beneco Enterprises ("Beneco") entered into a contract with the National Park Service for work on a maintenance and warehouse facility at Grand Canyon National Park. (Case–2313 Doc. 1) Pursuant to the Miller Act, 40 U.S.C. §§ 270a and 270b,[1] Beneco provided a payment bond issued by Travelers Casualty & Surety Company of America. In August 2001, Beneco entered into a subcontract with EPC Corporation ("EPC"). The subcontract provided that EPC would perform services such as excavation, grading, backfill, and the installation of utility lines in exchange for a payment of $3,806,915. (Case–2313 Doc. 1)

---

**1.** These sections were repealed in 2002. Their equivalent can now be found at 40 U.S.C. §§ 3131 and 3132. The Court's order dated February 26, 2004 provides more background regarding payment bonds and the scope of the Miller Act. (Doc. 30) This Order assumes some familiarity with the Miller Act.

After entering into this contract, EPC hired Standard Construction Company ("Standard") to perform a portion of its work. Thus, Standard became a sub-sub-contractor. (Doc. 88 p. 2) EPC and Standard began work on the project sometime after August 2001. On September 21, 2001, EPC sought payment for its work in the amount of $208,900. Later, on October 26, 2001, EPC sought payment in the amount of $416,000. (EPC SOF ¶ 2) Regarding the first pay application, Beneco issued a check on November 5, 2001 in the amount of $188,062 ($20,838 less than requested). Regarding the second pay application, Beneco issued a check on December 12, 2001 in the amount of $216,857 ($199,951 less than requested). (EPC SOF ¶¶ 3, 4) EPC received no other payments from Beneco. (*Id.*) EPC signed payment certifications and releases when it received these payments. Those releases stated that in return for the payments, EPC certified that it had "performed no additional work not covered by the Subcontract Price, and ... that [EPC] has no claim for additional compensation." The releases went on to provide that EPC "releases and waives any and all rights of lien, claims on bonds, or any and all causes of action whatsoever against the Owner, Beneco Enterprises, Inc., its surety, agents or employees arising from the Work which is the subject of the request for payment upon which this payment is made."

On January 11, 2002, various creditors filed an involuntary Chapter 11 petition against Beneco in the United States Bankruptcy Court for the District of Utah. Ten days later, on January 21, 2002, Beneco terminated EPC's subcontract under the contract's "termination for convenience" clause. EPC filed a proof of claim against Beneco in Utah bankruptcy court on July 3, 2002. That claim sought $2,791,617.65 for work performed by EPC prior to ter-

mination. This amount included $1,323,020.98 for work performed under the subcontract and $1,468,596.67 for "additional" or "changed" work not contained in the subcontract. On November 15, 2002, EPC filed an action against Travelers seeking to recover $2,791,617.65 under the payment bond. On January 21, 2003, Standard filed a separate suit against EPC and Travelers seeking compensation for the work it performed on the project. Finally, Beneco filed an adversary proceeding against EPC on May 2, 2003 in the Bankruptcy Court. That complaint sought disallowance of certain claims by EPC. The complaint also claimed that EPC's performance had been defective and, as a result, Beneco had incurred additional charges.[2] Those additional charges meant that EPC owed Beneco $519,824. EPC moved to withdraw the reference and transfer the adversary proceeding to Arizona. That request was granted and the proceeding was transferred to this District.

EPC moved to consolidate the three actions, arguing that common issues of fact pervaded all three cases. The Court granted the motion to consolidate. (Case–2313 Doc. 53) There are currently three Motions for Partial Summary Judgment pending before the Court.

### 1. Travelers' Motion for Partial Summary Judgment

Travelers first seeks summary judgment regarding Standard's claims due to Standard's alleged failure to provide appropriate notice of its claims under the Miller Act. Travelers also seeks partial summary judgment regarding EPC's claims for work completed prior to the November 2, 2001 and December 10, 2001 payment certifications and releases. Travelers' third basis for summary judgment is that any

---

**2.** The additional charges are also referred to as "backcharges."

claim not previously released by EPC must be calculated according to the terms of EPC's subcontract. Finally, Travelers seeks partial summary judgment that EPC and Standard may not collect their attorneys fees pursuant to Arizona Revised Statutes ("A.R.S.") section 12–341.01.

### 2. EPC's Motion for Partial Summary Judgment

EPC seeks partial summary judgment against Travelers. EPC believes that it is entitled, as a matter of law, "to recover its actual costs, plus reasonable overhead and profit" from Travelers. EPC also seeks judgment that Travelers may not assert backcharges for "allegedly defective and incomplete work." (Doc. 89 p. 16)

### 3. Beneco's Motion for Partial Summary Judgment

Beneco seeks partial summary judgment against EPC claiming that EPC may not recover for additional or changed work performed by EPC. Beneco believes that EPC is entitled to recover only for work contemplated by the subcontract.

### ANALYSIS

### I. Jurisdiction

40 U.S.C. § 3133 provides that individuals providing labor or material on a project for which a payment bond was issued pursuant to the Miller Act may bring a civil action seeking to recover unpaid amounts. Such a civil action must be brought in the United States District Court for the "district in which the contract was to be performed and executed, regardless of the amount in controversy." 40 U.S.C. § 3133(b)(3)(B). EPC and Standard are seeking to recover for work allegedly done on a Miller Act project located in the state of Arizona. Accordingly, the Court has jurisdiction and venue is proper.

### II. Applicable Law

▪ The Court must determine if Standard complied with certain provisions of the Miller Act as well as the scope of the subcontract between Beneco and EPC. Standard's compliance with the Miller Act requires construing and applying the federal statute. Thus, the Court need not look beyond federal law on that issue. But the Ninth Circuit "has long held that state law controls the interpretation of Miller Act subcontracts to which the United States is not a party." *United States for Use and Benefit of Reed v. Callahan,* 884 F.2d 1180, 1185 (9th Cir.1989). *See also Continental Cas. Co. v. Schaefer,* 173 F.2d 5, 8 (9th Cir.1949) (applying "Washington substantive law of contracts" in Miller Act case). Therefore, state law applies when construing the agreement between Beneco and EPC.

▪ The parties do not agree which state's law is applicable. EPC asserts that Arizona law should apply. Beneco and Travelers claim that Utah law should be used because the subcontract states in two separate sections that the contract should "be construed and governed by the laws of the State Of Utah." In Miller Act cases, the Court must act "[l]ike a court sitting in diversity" and "use the law of the forum state to construe the agreement." *United States for Use and Benefit of Reed v. Callahan,* 884 F.2d 1180, 1185 (9th Cir. 1989). Accordingly, the Court will apply Arizona's conflict of laws doctrine.

"Arizona courts apply the Restatement to determine the applicable law in a contract action." *Swanson v. The Image Bank, Inc.,* 206 Ariz. 264, 77 P.3d 439, 441 (2003). If, as here, "a contract includes a specific choice-of-law provision, [the Court] must determine whether that choice is 'valid and effective' under Restatement [ (Second) of Conflict of Laws] § 187." *Id.* Restatement § 187 provides for a two-step

process. First, a court must determine "whether the disputed issue is one which the parties could have resolved by an explicit provision in their agreement." *Id.* (quoting Restatement (Second) of Conflict of Laws § 187 (1971)). If so, then the parties' choice of law provision will be given effect. Second, "if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue," the choice of law provision will be given effect, "unless either ... the chosen state has no substantial relationship to the parties or the transaction ... or ... application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state." *Id.* (quoting Restatement (Second) of Conflict of Laws § 187 (1971)).

▇ In this case, the parties disagree regarding the impact of a number of contractual provisions, but the Court concludes that *all* of these issues could have been resolved by an explicit provision in the parties' agreement. For example, EPC asserts that Beneco and Travelers may not assert any claims for backcharges for defective or incomplete work. The parties easily could have included an explicit provision in their contract specifying whether Beneco could charge EPC for work done to correct EPC's defective work.[3] Because all the issues could have been specifically dealt with in the parties' contract, the choice of law provision in the contract will be enforced. Accordingly, Utah law will be used in interpreting and construing the agreement.

### III. Standard for Summary Judgment

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, the dispute must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party; "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255, 106 S.Ct. 2505. Therefore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences

---

**3.** This example does not reflect the Court's opinion on the backcharges issue. As detailed later, the Court concludes that the contract *did* contain a relevant provision on backcharges.

are to be drawn in his favor" at the summary judgment stage. *Id.*

## IV. Travelers' Motion for Partial Summary Judgment

In its Motion for Partial Summary Judgment, Travelers seeks summary judgment regarding all of Standard's claims and the portion of EPC's claims linked to releases signed by EPC on November 2, 2001 and December 10, 2001. Travelers also seeks a determination that both Standard's and EPC's claims do not arise out of contract within the meaning of A.R.S. § 12–341.01.[4]

### A. Travelers Claims Against Standard

Travelers seeks summary judgment against Standard due to Standard's alleged failure to provide proper notice of its claims. Pursuant to the Miller Act, Standard had a right of action upon the payment bond only if it provided adequate notice to Beneco. 40 U.S.C. § 270b.[5] That notice had to be supplied "within 90 days from the date [Standard] did or performed the last of the labor or furnished or supplied the last of the material for which [the] claim is made." *Id.* The notice also had to include "with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed." *Id.* Finally, the notice had to be served "by any means that provides written, third-party verification of delivery." *Id.* Travelers alleges that the notices referenced in Standard's complaint "either do not exist or do not comply with the requirements of [the Miller Act]." The Court does not agree.

It is undisputed that all work on the project was stopped on January 21, 2002, giving Standard until April 21, 2002 to provide notice. In its response to Traveler's motion for summary judgment, Standard provided copies of various notices provided to Travelers. On March 23, 2002, Standard sent notice, via certified mail, to Travelers identifying the name of the project Standard had worked on, the name of Travelers' insured (Beneco), and the name of Beneco's sub-contractor (EPC). The notice also observed that Beneco had filed for bankruptcy protection and requested that Travelers send the appropriate documentation to allow Standard to file its claim "in a manner commensurate with [Travelers'] procedures." Travelers responded to this notice on April 5, 2002. In that response, Travelers requested Standard provide extensive documentation regarding its claim. On May 7, 2002, Standard complied with Travelers' request and sent another letter that included an "Affidavit of Claim" which contained the dollar amount breakdown of Standard's claim. This correspondence by Standard met the minimum requirements under the Miller Act.

■ The original notice was provided by Standard within 90 days of January 21, 2002, EPC was identified as the party "for whom the labor was done or performed," and the notice was delivered via certified mail. The fact that Standard provided notice directly to Travelers, rather than to Beneco, is explained by Beneco's bankruptcy proceedings at that time and Standard believing it could not serve notice of the claim on Beneco. Travelers provides no authority that notice to a surety is

---

4. Travelers also seeks summary judgment regarding the proper method of calculating EPC's claim. This issue will be dealt with in discussing EPC's Motion for Partial Summary Judgment. *See* Part V.

5. This provision is now at 40 U.S.C. § 3133(b).

insufficient under the Miller Act. *See Pittsburgh Builders Supply Co. v. Westmoreland Const. Co.,* 702 F.Supp. 106, 109 (W.D.Pa.1989) (finding notice to surety, but not to general contractor, sufficient under Miller Act for action against surety). Also, Travelers does not argue that the March 23, 2002 notice was deficient due to its lack of specificity regarding the amount due. *See United States for Use and Benefit of Hopper Bros. Quarries v. Peerless Cas. Co.,* 255 F.2d 137, 145 (8th Cir.1958) ("There can be no claim that any substantial right of any of the parties was in any degree affected by the omission from the written notice of the dollars and cents due.... To hold otherwise would be to exalt form over substance and frustrate the purpose for which the Act was passed."). Travelers was on notice of Standard's claim long before the 90 day window expired. Traveler's own correspondence points to the conclusion that Travelers knew of the claim within the time limits. Thus, Standard met its burden by coming forward with evidence that it complied with the Miller Act's notice requirements. Accordingly, Travelers' summary judgment motion regarding Standard's claims will be denied.

## B. Travelers' Claims Against EPC

The second argument in Travelers' motion for summary judgment involves the "payment certification and claims releases" signed by EPC on November 2, 2001 and December 10, 2001. According to the contract between Beneco and EPC, prior to any payment being made by Beneco to EPC, EPC had to provide "[a] completed Progress Payment Certification Release ... by which [EPC] certifie[d] that the Work for which payment [was] requested [had] been performed ... and that [EPC] and its lower-trier (sic) subcontractors and suppliers release[d] all mechanic's lien, bond and contract claims, based on materials provided and Work performed prior to the date of the Release."

EPC submitted two pay applications: one dated September 25, 2001 in the amount of $208,900 and one dated October 26, 2001 in the amount of $416,808. (EPC SOF p. 3) Commensurate with the pay applications, EPC signed Payment Certification and Claims Releases, affirming that it was receiving $188,062 and $216,857 in response to the pay applications and that it had "performed no additional work not covered by the Subcontract Price, and ... that it has no claim for additional compensation." The releases also stated that EPC released and waived "any and all rights of lien, *claims on bonds,* or any and all causes of action whatsoever against the Owner, Beneco Enterprises, Inc. *its surety,* agents or employees, arising from the Work which is the subject of the request for payment upon which this payment is made." (Emphasis added.) Travelers now asks the Court to enforce these releases and prevent EPC from recovering for work done prior to the dates these releases were executed.

According to Utah law, "[r]eleases are contractual provisions and should be interpreted according to well-developed rules of contract interpretation."[6] *Ward v. Intermountain Farmers Ass'n,* 907 P.2d 264, 267 (Utah 1995). The goal in contract interpretation is to give effect to the inten-

---

**6.** The contract states that all of the "Contract Documents shall be construed in accordance with the laws of the State of Utah." The term "Contract Documents" is defined in the contract as encompassing the "Subcontract Agreement, any and all addenda to [the] Agreement, the Scope of Work, the bid package documents" and documents related to the contract between Beneco and the National Park Service. EPC does not argue that the payment releases do not qualify as "Contract Documents." Accordingly, the releases will be interpreted according to Utah law.

tion of the parties. *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991). A court may consider extrinsic evidence to determine the parties' intention. *Ward*, 907 P.2d at 268 (observing that even when "the terms of an instrument ... seem clear to a particular reader," a Court may "consider any credible evidence offered to show the parties' intention."). "If after considering such evidence the court determines that the interpretations contended for are reasonably supported by the language of the contract, then extrinsic evidence is admissible to clarify the ambiguous terms." *Id.*

■ Applying these principles to the current case, the Court is not limited to the language of the releases. In his deposition, Beneco's Project Manager Curtis Williams admitted that the releases signed by Mr. Shaw, president of EPC, were not understood to waive EPC's rights to all amounts previously requested by EPC.

> **Question:** You didn't think when—when Mr. Shaw signed this waiver that he was waiving his right to be paid the balance of his invoice number two, did you?
>
> **Mr. Williams:** My interpretation of this would have been, at the time this was signed and the time discussed with Mr. Shaw, is that a second check was in transit.
>
> * * *
>
> **Question:** "So by—by taking $216,000 did you understand that Mr. Shaw was waiving EPC's right to be paid the other $200,000 that was due to him?"
>
> **Mr. Williams:** "Oh, absolutely not."
>
> * * *
>
> **Question:** "[T]he intention of this waiver was only to waive Mr. Shaw's claim for the money he received, 216,000. He did not at this point waive his

right to be paid the balance of invoice number two, did he?"

> * * *
>
> **Mr. Williams:** No, I don't believe he waived-I don't believe by-by signing this that he acknowledged that he would accept $216,000 on a 400 and something thousand dollar payment, no.

In light of this evidence, the Court concludes that the releases are reasonably susceptible to the interpretation that they did not release all of EPC's claims but only released the claims for which payment was being received. In other words, EPC had to allocate the payment received to certain portions of the payment request. Taking the December release as an example, EPC received $216,857 on its payment request of $416,808. The $216,857 could have been used to pay for work items one, two, seven, eight, nine, eleven, twelve, fifteen, and a portion of sixteen. (See October 26, 2001 invoice) The release would then prevent EPC from asserting a claim for any additional compensation on those work items. EPC would be free, however, to recover the remainder of its original payment request because it never waived its right to payment on work items sixteen and twenty-four.

Pursuant to this interpretation of the releases signed by EPC, EPC may seek to recover the amounts requested in the payment requests but never paid by Beneco.[7] Therefore, Travelers' Motion for Partial Summary Judgment on this issue will be denied.

### C. Travelers' Argument Regarding A.R.S. § 12–341.01

■ Travelers' final argument is that EPC and Standard may not recover attorneys fees pursuant to A.R.S. § 12–341.01.

---

7. The Court addresses EPC's claims for changed work in Part VI.

That statute allows for the recovery of fees in contract actions. Neither EPC nor Standard has a contract with Travelers. Also, according to the Supreme Court, a successful Miller Act plaintiff is not entitled to an award of fees. *F.D. Rich Co., Inc. v. United States for Use of Indus. Lumber Co., Inc.*, 417 U.S. 116, 128, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974). *Cf. United States for Use and Benefit of Reed v. Callahan*, 884 F.2d 1180, 1185 (9th Cir. 1989) (allowing recovery of attorneys' fees in Miller Act case only because contract specifically addressed issue). The Supreme Court recognized that the issue of attorneys' fees in Miller Act cases would involve complicated issues of state law. *F.D. Rich*, 417 U.S. at 128, 94 S.Ct. 2157. The Court thought it best "to extricate the federal courts from the morass" of state law regarding attorneys' fees. *Id.* Accordingly, Travelers' Motion for Partial Summary Judgment will be granted to the extent that EPC is not entitled to an award of its attorneys' fees pursuant to A.R.S. § 12–341.01, even if it is ultimately successful at trial.

## V. EPC's Motion for Partial Summary Judgment

There are two issues presented in EPC's Motion for Partial Summary Judgment against Travelers. The first is the proper interpretation of the termination for convenience clause in the subcontract.[8] EPC believes that it "is entitled as a matter of law to recover its actual costs, plus a reasonable overhead and profit." (Doc. 89 p. 1–2) Travelers believes that the subcontract provides a clear method of measuring compensation which must be followed, and that method does not allow for the recovery of actual costs. The second issue is whether Travelers and Beneco can "recov-er backcharges for allegedly defective or incomplete work." (*Id.*) EPC believes that neither Travelers nor Beneco may assert backcharges because EPC was not given an opportunity to correct the allegedly defective work. Travelers and Beneco counter that "EPC cannot avoid the cost of repairing work it certified was performed in compliance with the terms of the contract." (Response to 89 p. 1) For the following reasons, the Court will deny EPC's motion.

The parties' contract contained two clauses addressing termination, a termination for convenience clause and a termination for default clause. The termination for convenience clause provided that Beneco could chose to terminate the agreement "for any cause." In that event, the clause required Beneco "pay [EPC] for that Work actually performed in an amount proportionate to the sum payable under [the] Agreement." The clause also stated that Beneco would "not be liable to [EPC] for any other costs nor for prospective profits on Work not performed." The termination for default clause allowed for termination if EPC failed to "supply sufficient, properly skilled workers, or materials or equipment" or if EPC did not properly perform its work on schedule. The parties agree that EPC was terminated pursuant to the termination for convenience clause. EPC believes that the language of that clause should be interpreted to allow it to recover its actual costs (including overhead and profits) rather than merely an amount proportionate to the sum payable under the contract. Again, evaluating the contract under Utah law, it is clear that EPC's recovery must be computed using the formula provided in the contract.

---

8. There is no dispute that Beneco terminated EPC pursuant to that clause and not the ter-mination for default clause.

■ As observed earlier, Utah law provides that the goal in contract interpretation is to give effect to the parties' intentions. *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991). Pursuant to the parties' agreement, the termination for convenience clause provided that in the event of termination, Beneco would pay EPC "for that Work actually performed *in an amount proportionate to the sum payable under [the] Agreement.*" (Emphasis added.) The subcontract also allowed Beneco to "offset any sums due [EPC] ... [by] the amount of any backcharges or unpaid obligations of [EPC] to Beneco." Travelers and Beneco believe that these two provisions, read together, require Beneco to pay EPC for the percentage of work it completed but allow Beneco to deduct for work done to bring EPC's work up to the contract specifications. EPC provided no evidence that the parties intended these clauses to have any other meaning than what is contained in the contract itself. *See Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 267 (Utah 1995) (allowing for introduction of extrinsic evidence to determine if contract is truly ambiguous).

■ To determine the parties' intentions, the Court may look to the parties' conduct prior to litigation. As stated by the Utah Supreme Court, "[a] construction given to [a contractual provision] by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court." *Upland Indus. Corp. v. Pacific Gamble Robinson Co.*, 684 P.2d 638, 642 (Utah 1984) (quoting *Rosen v. E.C. Losch Inc.*, 234 Cal.App.2d 324, 44 Cal.Rptr. 377, 381 (1965)). *Accord Okelberry v. W. Daniels Land Ass'n*, 120 P.3d 34, 40 (Ut.Ct.App. 2005) (finding prior conduct of parties relevant to contract interpretation).

During the course of their relationship, EPC submitted to Beneco at least two invoices containing percentages of completion. On an invoice dated January 14, 2002, EPC claimed that "mobilization" was 60% complete. The total cost for mobilization was $190,000. Therefore, EPC believed it had already earned $114,000 (60% of $190,000 is $114,000). Also on that invoice, EPC claimed that the "mass grading" was 92% complete and it had earned $220,800 of the $240,000 total price (92% of $240,000 is $220,800). On January 21, 2002, Beneco sent notice to EPC that the contract was terminated. Beneco requested EPC provide "a final invoice based on [the] percent of completed work." (EPC SOF Ex. 9) On January 25, 2002, EPC submitted an invoice reflecting the amounts earned based on the percentage of each task completed. (January 25, 2002 invoice) Thus, it is undisputed that prior to litigation, EPC was calculating the amounts it had earned on the project as percentages of the total amount due and *not* on a cost plus profit basis.

There is no evidence in the record of any conduct by the parties prior to litigation regarding backcharges. Therefore, the same analysis cannot be used to interpret that portion of the contract. The contract's language regarding backcharges, however, is straightforward. The contract allows Beneco to offset any sums due to EPC by the amount of backcharges. To disregard this provision would place Beneco in an untenable position. Beneco would have to pay all of EPC's projected costs and also pay another party to fix EPC's defective work and to complete the project. This would be an unreasonable reading of the contract and the Court will not endorse such a reading. *See Okelberry v. W. Daniels Land Ass'n*, 120 P.3d 34, 41 (Utah Ct.App.2005) (stating court may not endorse contract interpretation that leads to absurd result).

 The Court concludes that according to the contract Beneco is required to pay EPC for the percentage of the work EPC completed but Beneco is allowed to deduct backcharges where appropriate.[9] EPC's argument that it is entitled to its actual costs (plus a reasonable overhead and profit), rather than the contractual formula, is not supported by the record. It is "elementary and of extreme practical importance that [a court] hold contracting parties to their clear and understandable language deliberately committed to writing and endorsed by them as signatories thereto." *Jensen's Used Cars v. Rice,* 7 Utah 2d 276, 323 P.2d 259, 260–61 (1958). EPC freely entered into the contract and provided a post-termination invoice reflecting it had earned a percentage of the total contract price. Also, allowing Beneco to assess backcharges was provided for in the agreement and is the most reasonable interpretation of the parties' relationship. EPC cannot now seek to change the terms of the contract by substituting a new formula regarding EPC's measure of payments due or claiming that it is entitled to payment for work, regardless of the quality of that work.

Contrary to EPC's argument, the Court's construction of the termination for convenience clause and allowance of backcharges does not render the contract meaningless. EPC argues that under the interpretation adopted by the Court, the termination for convenience clause operates in an identical fashion as the termination for default clause. This overstates the similarity of the clauses. The termination for default clause provided that Beneco could terminate EPC if it failed to comply with its contractual obligations.

In that event, Beneco could deduct from EPC's payment "all charges, expenses, losses, costs, damages and attorneys' fees." In the event of termination for convenience, Beneco was entitled to only deduct "backcharges or unpaid obligations." Specifically, the termination for convenience clause *does not* allow Beneco to deduct all losses, damages, and attorneys' fees. Under the termination for convenience clause, for example, Beneco could not deduct from EPC's recovery the expenses incurred as a result of the delay in completion of the contract; Beneco *could* make such a deduction if EPC were terminated for default. As written, the termination for convenience clause is understandably more favorable to EPC.

 Finally, EPC believes that it is entitled to recover its costs under a quantum meruit theory. Having found that a valid contract exists between the parties and that the contract provides the measure of compensation EPC is due, it is improper to allow EPC to recover under a quantum meruit theory. *See Davies v. Olson,* 746 P.2d 264, 268 (Utah Ct.App.1987) ("Recovery under *quantum meruit* presupposes that no enforceable written or oral contract exists."); *USLife Title Co. of Arizona v. Gutkin,* 152 Ariz. 349, 732 P.2d 579, 584 (1986) ("[O]ur courts have repeatedly held that the existence of a contract specifically governing the rights and obligations of each party precludes recovery for unjust enrichment.").

 EPC admits, and neither Travelers nor Beneco contests, that disputed issues of fact exist for determining the percentage of work completed by EPC and

---

**9.** EPC cites to a number of cases where backcharges were not allowed pursuant to government contracts. *See, e.g., Appeal of New York Shipbuilding Co.,* 1972 WL 1601 (Armed Services Board of Contract Appeals 1972). But the parties's agreement in this case explicitly allows for the deduction of backcharges. The Court concludes that "[t]he express agreement of the parties on the question takes precedence over any contrary holding" by a board of contract appeal. *Aydin Corp.,* 1989 WL 74785 (E.B.C.A.1989).

the proper amount of backcharges. That question will be resolved at trial. EPC's Motion for Partial Summary Judgment will be denied.

## VI. Beneco's Claims Against EPC

The sole issue presented in Beneco's Motion for Partial Summary Judgment against EPC is whether EPC's claim of $1,468,596.67 related to additional or changed work may be asserted. Beneco believes that EPC's request for $1,468,596.67 based on changed work should be disallowed for two reasons. First, because EPC certified at the time payments were received that it had completed no additional work. Second, because the procedures for asserting such a claim were not followed. Beneco succeeds on the first argument in part, but fails on the second argument.

### A. Certifications

The first argument involves the releases signed by EPC. According to Beneco, the release executed by EPC on December 10, 2001 prevents any claim for additional work. The release stated that EPC had "performed no additional work not covered by the Subcontract Price, and ... that it has no claim for additional compensation." Beneco argues that EPC is bound by this release, meaning EPC may not recover for any changed work completed prior to December 10, 2001. But Beneco has previously admitted that, at most, the certification executed by EPC was a waiver of claims only through October 2001. In his deposition, Beneco's project manager addressed the effective date of the December 10, 2001 release.

> **Question:** [I]f Beneco had been able to pay [EPC] the full amount of invoice number two and [the release] had been prepared to show receipt of

$416,808, it would only be a waiver through the date of the work being requested for payment, which would be October 2001, correct?

> **Mr. Williams:** Yes. This—this says, for which payment has been requested so it's a waiver for which payment has been requested. So it would have been through that period of time, it would have been through that invoice—
> * * *

> **Question:** But the waiver—you rely upon this form for notification but the waiver is only for work in October. Right?

> **Mr. Williams:** The period of time for which this request was was for the month of October.

(Williams Depo. p. 155–156). Thus, Beneco's claims that EPC has waived all claims prior to December 2001 is inconsistent with Beneco's own admissions. The language of the release also supports a finding that EPC did not waive all claims prior to December 10, 2001.

The release states EPC waived "any and all rights of lien, claims on bonds, or any and all causes of action whatsoever against [Beneco] ... *arising from the Work which is the subject of the request for payment upon which this payment is made.*" (Emphasis added.) The work Beneco was paying for was from October 2001. The release's language reflects an intention by EPC to waive all claims as of the payment request date, October 26, 2001, *not* an intention to waive all claims as of the date the release was signed, December 10, 2001. Giving proper effect to the December 10, 2001 release, EPC may not seek to recover for changed work completed prior to October 26, 2001.[10] Beneco's Motion for Par-

---

**10.** EPC may, of course, be entitled to recover the remainder of the October 26, 2001 pay request for work completed pursuant to the subcontract. *See* Part IV(B).

tial Summary Judgment will be granted in part.

## B. Change Order Procedures

■ Beneco's second argument is that the parties' written contract provided specific procedures for EPC to follow regarding changed work, EPC did not follow the procedures, and EPC's claims are therefore barred regardless of the releases signed by EPC. There is a question of fact whether the parties modified the requirements regarding changed work during the course of their relationship. Accordingly, summary judgment will be denied.

The agreement between Beneco and EPC is interpreted according to Utah law. The agreement provides specific guidance on the issue of changes in the scope of the work. According to the contract,

Beneco may order changes in the Work. No alteration, addition, omission or change shall be made in the Work or the method *or manner of performance of the* Work except upon the *written change order* of Beneco.... Any change or adjustment in the contract price by virtue of such change order shall be specifically stated in the applicable change order. Prior to the issuance of any change order, Beneco may require [EPC] to furnish to Beneco a detailed itemization showing the value of the Work, labor, services and materials altered, added, omitted or changed by the proposed change order, and the corresponding overhead and profit amounts. If an agreement as to monetary allow-

ance or any other term in the change order cannot be reached, Beneco, by an authorized representative, may direct [EPC] in writing to perform the Work with the final adjustment reserved until final completion of both this Agreement and the prime contract.

(Emphasis added.) The contract also contains a clause stating that the contract "may not be changed in any way ... and no term or provision hereof may be waived by Beneco except in writing signed by its duly authorized officer or agent." The interpretation of these clauses is the issue.

■ Utah has long recognized that "parties to a written agreement may not only enter into separate, subsequent agreements, but they may also modify a written agreement through verbal negotiations subsequent to entering into the initial written agreement, even if the agreement being modified unambiguously indicates that any modifications must be in writing." *R.T. Nielson Co. v. Cook*, 40 P.3d 1119, 1124 n. 4 (Utah 2002).[11] Thus, it is at least possible that the parties orally modified their agreement at some point despite the requirement that all modifications be in writing. If the parties did modify their agreement regarding changed work, then EPC's claims for that work are not automatically barred. There is sufficient admissible evidence of a modification to require that the issue be resolved at trial.

As early as September 26, 2001, EPC sent a letter to Beneco claiming that it was incurring additional expenses on the pro-

---

11. *R.T. Nielson* also recognizes that "if an original agreement is within the statute of frauds, a subsequent agreement that modifies the original agreement must also satisfy the requirements of the statute of frauds to be enforceable." 40 P.3d at 1124 n. 4. The agreement at issue likely falls under the statute of frauds because it was not to be completed within one year. *See* Utah Code Ann. § 25–5–4. But there is an exception "where

a party has changed position by performing an oral modification so that it would be inequitable to permit the other party to found a claim or defense on the original agreement as unmodified." *Allen v. Kingdon,* 723 P.2d 394, 396–97 (Utah 1986). EPC continued to work on the project during the course of its conversations with Beneco regarding changed work; it would be inequitable to allow Beneco to use the statute of frauds in this setting.

ject. On October 15, 2001, Beneco sent a letter to EPC regarding EPC's "Claim for Additional Costs Due to Design Delays." That letter stated that Beneco was "very aware" of the problems EPC was encountering at the project. On January 7, 2002 EPC sent a letter to Beneco stating that additional work not contemplated by the subcontract had to be completed due to delays in the project. On January 8, 2002, EPC sent yet another letter to Beneco detailing a conversation between EPC and Beneco regarding additional costs. That letter reasserted EPC's claim that extra costs "can, have and will continue to occur" at the project. And on March 4, 2002 EPC sent a letter stating that additional costs had been "discussed on numerous occasions." The additional costs allegedly arose from "changes, latent conditions, directed acceleration, unanticipated winter conditions and other unforeseen issues." Taken together, it appears that the parties may have engaged in repeated communications involving the possibility of increased costs and EPC incurred some of these costs at the direct behest of Beneco. *See* March 4, 2002 letter to Beneco (stating that additional costs incurred as a result of "directed acceleration"). There is a question of fact regarding whether the parties entered into a subsequent agreement which relaxed the strict requirements regarding changed work set forth in the contract. If the parties agreed that additional work should be performed by EPC or if Beneco explicitly directed EPC to perform additional work, then EPC would be entitled to recover the amounts connected to that additional work. This is a fact issue to be resolved at trial.[12] Summary judgment will be denied.

Accordingly,

**IT IS ORDERED** that Traveler's Motion for Partial Summary Judgment (Doc. 87) is **DENIED IN PART** and **GRANTED IN PART**. Standard may pursue its claims against Travelers; EPC may not seek additional compensation for items it has already received payment on but may pursue the unpaid invoiced amounts; and neither Standard nor EPC may recover attorneys fees pursuant to A.R.S. § 12–341.01.

**IT IS FURTHER ORDERED** that EPC's Motion for Partial Summary Judgment (Doc. 89) is **DENIED**. EPC is entitled to recover any amount due according to the calculation set forth in the parties' agreement and that agreement allows Travelers to assert backcharges for defective work.

**IT IS FURTHER ORDERED** that Beneco's Motion for Partial Summary Judgment (Doc. 91) is **GRANTED IN PART** and **DENIED IN PART**. EPC may attempt to prove at trial its entitlement to recover for additional work but may not recover for additional work completed prior to October 26, 2001.

**IT IS ORDERED** the parties file a Joint Proposed Pretrial Order, all Motions in Limine, a Joint Statement of the Case, the Joint Jury Instructions, a Verdict Form, and Stipulated Voir Dire Questions by April 21, 2006.

**IT IS FURTHER ORDERED** the Final Pretrial Conference is set for May 26, 2006 at 1:30 pm.

**IT IS FURTHER ORDERED** trial is set for June 13, 2006 at 9:00 am.

---

**12.** As observed in Part VI(A), EPC signed releases stating that no changed work had been performed. Those releases must be given effect. Thus, EPC may only recover for changed work completed after the effective date of the last release, October 26, 2001.